IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA**,
*Appellee*,

*v.*

**ALAN MATTHEW CHAMPAGNE**,
*Appellant*.

---

No. CR-17-0425-AP
Filed August 7, 2019

---

Appeal from the Superior Court in Maricopa County
The Honorable Pamela S. Gates, Judge
No. CR2013-000177-002
**AFFIRMED**

---

COUNSEL:

Mark Brnovich, Arizona Attorney General, O.H. Skinner, Solicitor General, Lacey Stover Gard, Chief Counsel, Capital Litigation Section, Julie A. Done (argued), Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Garrett W. Simpson (argued), Garrett Simpson PLLC, Glendale, Attorney for Alan Matthew Champagne

JUSTICE BOLICK authored the opinion of the Court, in which CHIEF JUSTICE BALES (RETIRED), VICE CHIEF JUSTICE BRUTINEL, and JUSTICES TIMMER, GOULD, LOPEZ, and PELANDER (RETIRED) joined.

JUSTICE BOLICK, opinion of the Court:

¶1        Alan Matthew Champagne was convicted of the first-degree murder of Brandi Hoffner, the second-degree murder of Philmon Tapaha, kidnapping Hoffner, and two counts of abandonment or concealment of a dead body.  He was sentenced to death for the first-degree murder.  We have jurisdiction over this direct appeal under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.  For the following reasons, we affirm Champagne's convictions and sentences.

**BACKGROUND**

¶2        On June 23, 2011, Champagne and three friends drank alcohol and used methamphetamine at his apartment.[1]  One friend, Elise Garcia, spent the night.  Early the next morning, she was in the bathroom when two people entered the apartment with Champagne.  As she walked into the living room, Garcia heard a gunshot and then saw Tapaha on the couch with a bullet wound to his head, blood on the walls and the couch, and Champagne standing next to him holding a gun.  Tapaha's girlfriend, Hoffner, cried at the sight of her dead boyfriend, saying, "I loved him."

¶3        Champagne attempted to calm Hoffner and asked if she wanted to get high.  Hoffner nodded affirmatively, and he led her into the bedroom and gave her a bong and methamphetamine for her to smoke.  Garcia followed them into the bedroom and sat in the doorway.  Champagne left the room briefly, placing a gun in Garcia's lap before he exited the room.  Garcia testified that when she locked eyes with Hoffner, Hoffner understood she would not be allowed to leave.  When Champagne

---

[1]  "We view the facts in the light most favorable to sustaining the jury's verdict."  *State v. Rushing*, 243 Ariz. 212, 216 n.2 (2017) (citing *State v. Gallegos*, 178 Ariz. 1, 9 (1994)).

returned, he came behind Hoffner as she was smoking and slipped an electrical cord fashioned into a noose around her neck. Hoffner struggled, clawing with both hands at the cord trying to breathe as Champagne used a wrench to tighten the cord with each turn. Garcia recalled Hoffner's face turning purple as Champagne strangled her to death.

¶4　　　　After Champagne killed Hoffner, he kept the bodies in his apartment for approximately one week. Eventually, Champagne placed the decomposing bodies into a large wooden box, which he buried in his mother's backyard. About twenty months later, a landscaper discovered the box containing the bodies.

¶5　　　　The State charged Champagne with two counts of first-degree murder for the killings of Tapaha and Hoffner, one count of kidnapping Hoffner, and two counts of abandonment or concealment of the bodies. The jury found Champagne guilty on all charges, except that it found him guilty of second-degree murder for the killing of Tapaha. The jury found three aggravating circumstances: (1) Champagne had been previously convicted of a serious offense, A.R.S. § 13-751(F)(2); (2) he murdered Hoffner in an especially cruel manner, § 13-751(F)(6); and (3) he was convicted of multiple homicides during the commission of the offense, § 13-751(F)(8). The jury found that the proffered mitigation was not sufficiently substantial to call for leniency and Champagne was sentenced to death for Hoffner's murder. This automatic appeal followed.

## DISCUSSION

### A. Request for Change of Counsel

¶6　　　　Champagne contends that the trial court erred in summarily dismissing his request to change counsel and failing to adequately inquire into whether a true conflict existed, thus violating his constitutional right to conflict-free counsel. We review a trial court's decision to deny a request for new counsel for abuse of discretion. *State v. Cromwell*, 211 Ariz. 181, 186 ¶ 27 (2005).

¶7　　　　Before trial, Champagne filed a pro per motion to change counsel, which the trial court described as a "[bare] bones hand-written motion" that cited "no particular reason" why counsel should have been changed. Defense counsel maintained that Champagne had a "good faith

basis to ask for new counsel" and informed the court that there was a bona fide conflict of interest because Champagne said he was filing a complaint against her with the State Bar of Arizona. Because of that conflict, counsel asserted that she and her co-counsel needed to be "removed from representing Mr. Champagne any further." The trial court denied counsel's oral motion to remove capital counsel, who had been working on the case for eighteen months, and instructed counsel to file a motion if she believed it was appropriate for Champagne to obtain new counsel. She did not do so.

¶8 Three-and-one-half months later, Champagne wrote a letter to the court, repeating his request for new counsel and alleging his current counsel had fallen asleep during his recent, unrelated trial, which resulted in over a 700-year sentence. But after the court reviewed his letter, Champagne informed the court that he wanted his attorney to visit him in jail to explore whether they could "reach some type of an understanding or working relationship." Despite a productive jail visit, Champagne indicated to the court that he still wanted to change his counsel.

¶9 The court treated Champagne's letter as a motion to change counsel and addressed it at a hearing. The prosecutor noted that a delay in trial due to change in counsel would impact witness availability and the victims' rights to a speedy trial. The court then conducted an ex parte hearing in the presence of only Champagne and his attorney on the purported conflict. Champagne told the court he wanted to change counsel because his lawyer fell asleep during his previous trial—which, according to Champagne, alone constituted adequate grounds to change counsel— and that she was not visiting him or discussing the current case with him.

¶10 In response, Champagne's counsel explained that Champagne was extremely unhappy about the outcome of his prior trial, that he became hostile and uncooperative, and that he refused visits from counsel's mitigation specialist. She detailed the extensive amount of time and work that she spent preparing for this case. Moreover, she told the court she was willing to assist Champagne in accurately and adequately preserving a record of the allegations surrounding her perceived behavior during his prior trial. Ultimately, Champagne's counsel asserted that a change of counsel was not in Champagne's best interests and that she did not believe the relationship was irretrievably broken but that they could

work together and proceed to trial. The trial court denied Champagne's request for new counsel.

¶11 The trial court did not abuse its discretion. Champagne argues that the Court should "*presume* the prejudice because there was a showing of actual conflict of interest." He relies considerably on counsel's initial statement that he had a good-faith basis for requesting a change of counsel, maintaining that the court's denial of his request resulted in structural error tainting his entire trial. But that statement came shortly after Champagne informed his attorney that he intended to pursue a bar complaint against her. And Champagne ignores counsel's subsequent statements that the relationship was not irretrievably broken, that a change of counsel was not in his best interests, that she was dedicated to his current case, and that she was willing to help him establish a record of his allegations relating to her perceived behavior in his prior trial.

¶12 Although the Sixth Amendment guarantees an accused the right to counsel, a "defendant is not, however, entitled to counsel of choice or to a meaningful relationship with his or her attorney." *Cromwell*, 211 Ariz. at 186 ¶ 28. A defendant is deprived of his constitutional right to counsel "if either an irreconcilable conflict or a completely fractured relationship between counsel and the accused exists." *State v. Hernandez*, 232 Ariz. 313, 318 ¶ 12 (2013) (internal quotation marks omitted). Such a "deprivation of a defendant's Sixth Amendment right to counsel infect[s] the entire trial process," requiring automatic reversal. *State v. Moody* (*Moody I*), 192 Ariz. 505, 509 ¶ 23 (1998) (alteration in original) (internal quotation marks omitted). A "[c]onflict that is less than irreconcilable, however, is only one factor for a court to consider in deciding whether to appoint substitute counsel." *Cromwell*, 211 Ariz. at 186 ¶ 29.

¶13 Trial courts have a duty to inquire into the basis of a defendant's request for change of counsel. *State v. Torres*, 208 Ariz. 340, 343 ¶ 7 (2004). But the nature of that inquiry depends on the nature of the defendant's request. *Id.* ¶ 8. On the one hand, if the defendant sets forth "sufficiently specific, factually based allegations in support of his request for new counsel, the . . . court must conduct a hearing into his complaint." *Id.* (alteration in original) (internal quotation marks omitted). On the other hand, "generalized complaints about differences in strategy may not require a formal hearing or an evidentiary proceeding." *Id.* A trial court's failure to conduct an inquiry into a purported conflict can, under certain

circumstances, serve as a basis for reversing a defendant's conviction. *See Holloway v. Arkansas*, 435 U.S. 475, 487–91 (1978).

**¶14** Trial courts should examine requests for new counsel "with the rights and interest of the defendant in mind tempered by exigencies of judicial economy." *State v. LaGrand*, 152 Ariz. 483, 486 (1987). This Court has identified several factors—known as the *LaGrand* factors—for trial courts to consider when ruling on motions for change of counsel:

> whether an irreconcilable conflict exists between counsel and the accused, and whether new counsel would be confronted with the same conflict; the timing of the motion; inconvenience to witnesses; the time period already elapsed between the alleged offense and trial; the proclivity of the defendant to change counsel; and quality of counsel.

*Id.* at 486–87. Here, "[a]lthough the trial court could have engaged in a more searching exploration" of the responses from Champagne's attorney as to the truthfulness behind his claim that she fell asleep during his prior trial and the repercussions of that alleged behavior on their attorney-client relationship, *see Hernandez*, 232 Ariz. at 318–19 ¶ 16, the court did not abuse its discretion because it sufficiently inquired into the purported conflict and considered the *LaGrand* factors.

**¶15** First, the court determined that there was no irreconcilable breakdown in communication between Champagne and his counsel. Champagne had the burden of proving "either a complete breakdown in communication or an irreconcilable conflict," and, to satisfy that burden, he needed to "present evidence of a severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible." *Hernandez*, 232 Ariz. at 318 ¶ 15 (internal quotation marks omitted). The court concluded that the circumstances did not amount to an irreconcilable breakdown in communication, that Champagne was able to communicate with his lawyer, and that he was receiving effective representation. And while the court noted that Champagne may understandably be upset and have "some trust issues" if counsel truly fell asleep during a brief period of his prior trial, "[a] mere allegation of lost confidence in counsel does not require appointing substitute counsel." *State v. Bible*, 175 Ariz. 549, 591 (1993).

¶16        Second, the court noted that new counsel would likely be confronted with the same conflict.  Other than the allegation that counsel slept during part of his previous trial, Champagne's main concern was that his attorney was not adequately communicating with him.  However, counsel told the court that she had visited Champagne multiple times in jail, as had her mitigation specialist, but that he sometimes refused visits.  Additionally, counsel said that her challenging trial schedule had made it difficult to see Champagne for a few months, but that she was nonetheless preparing for his trial and ready to move forward.  Based on that information, the court found that a change in counsel would likely result in the same purported conflict because new counsel might also be unable to visit and confer with Champagne as often as he would like, making it conceivable that the court could find itself in the same circumstance with a change of counsel.

¶17        Third, the court found that granting Champagne's request would delay trial, which could ultimately inconvenience witnesses.  The prosecutor explained how a change of counsel would delay trial and make it difficult for the State to get certain witnesses to court.  *See Cromwell*, 211 Ariz. at 187 ¶¶ 34–35 (noting that the fact that appointing new counsel would cause delay and inconvenience to witnesses was part of a "proper balancing of relevant interests" under *LeGrand*).  Here, not only would a delay stemming from change in counsel have resulted in inconvenience to witnesses, but it may have prejudiced the State's case.

¶18        Fourth, the court explicitly noted the quality of counsel.  The court observed that Champagne's counsel was "one of the best capital defense attorneys in the State of Arizona" and that she was "aggressively" working on his case.

¶19        Finally, the court considered the timing of Champagne's motion and the time that had already elapsed since the alleged offense.  Champagne's request for new counsel came after counsel had invested substantial time and effort into the case, nearly two years after Champagne committed the murders, over a year after he was indicted, less than a year before trial was scheduled to begin, and only after Champagne lost his previous trial and was sentenced to more than 700 years.  The court considered the "substantial" delay that would be caused by a change in counsel, concluding that "[i]t would absolutely prejudice the victim[s'] interest[s] and the community interest in a speedy resolution of this

7

matter." *See* Ariz. Const. art. 2, § 2.1(A)(10); *Phx. Newspapers, Inc. v. Otis*, 243 Ariz. 491, 496 ¶ 16 (App. 2018).

¶20 In fact, only one *LaGrand* factor weighed in Champagne's favor—the proclivity of the defendant to change counsel—as he had not previously requested a change of counsel. But one factor weighing in Champagne's favor does not necessitate a finding that he was entitled to change counsel when the other factors weighed in support of denying his request. *See LaGrand*, 152 Ariz. at 486–87. Thus, the court did not abuse its discretion in denying Champagne's request for change of counsel.

¶21 The trial court did not explicitly refer to the *LaGrand* factors, but the record indicates that the court considered these factors in assessing and denying Champagne's request for change of counsel. *See Hernandez*, 232 Ariz. at 321 ¶¶ 34–36 (finding trial court did not abuse its discretion when it considered the *LaGrand* factors but "did not explicitly refer to the aforementioned factors"). Although we encourage trial courts to make explicit *LaGrand* findings, the record here nevertheless reflects the court's adequate consideration of the factors.

## B. Question 78 of the Jury Questionnaire

¶22 Champagne argues that the trial court erred by telling the jury during voir dire and in the jury questionnaire that a life sentence could result in the possibility of Champagne's release after twenty-five years. Because Champagne did not object at trial, he has forfeited any right to appellate relief unless the purported error rises to the level of fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19 (2005); *see also State v. Bush*, 244 Ariz. 575, 591 ¶¶ 66–68 (2018). We review whether the trial court properly instructed the jury de novo. *State v. Rushing*, 243 Ariz. 212, 221 ¶ 36 (2017).

¶23 Champagne is ineligible for parole under Arizona law. *See* A.R.S. § 41-1604.09(I). In *Simmons v. South Carolina*, a plurality of the United States Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. 154, 156 (1994) (plurality opinion). The Court emphasized that "it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater

threat to society than a defendant who is not," and "there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole." *Id.* at 163–64.

**¶24** Before trial, Champagne requested a *Simmons* instruction. The State did not object and the final jury instructions during the penalty phase properly included the following *Simmons* instruction: "If a life sentence is imposed, parole is unavailable to Mr. Champagne under state law." The record does not indicate and Champagne does not argue that the court or the parties suggested during trial that, if sentenced to life, Champagne had the possibility of release on parole.

**¶25** Here, the thrust of Champagne's argument is that the trial court contradicted *Simmons* "by telling the jury repeatedly that despite the lack of parole Mr. Champagne could be released after 25 years for any reason sufficient to the court." The jury questionnaire used during voir dire briefly mentioned the possibility of parole. Specifically, question 78 read:

> If you determine that the appropriate sentence is life, the judge will determine if the sentence will be life without the possibility of release or *life with the possibility of release only after at least 25 years have been served*. Do you agree with the law that requires the judge, not the jury, to make the decision about which type of life sentence to impose?

(Emphasis added.) During voir dire, the court addressed prospective jurors who responded in the negative to question 78 by reiterating the question and asking if their disagreement with the law would affect their decision-making process regarding sentencing and their ability to apply the law.

**¶26** Champagne incorrectly contends that the court provided no curative statement to the language in question 78. Any possible misconception that parole was available to Champagne resulting from question 78 was cured when the trial court instructed the jury during the penalty phase that Champagne was ineligible for parole under state law. *Cf. State v. Hulsey*, 243 Ariz. 367, 396 ¶ 137 (2018) ("The impression that [the defendant] 'could be released on parole if he were not executed' was created by the court in the aggravation phase and was never rectified. Because this misperception was never cured or contradicted, its impact carried over to the penalty phase." (quoting *Simmons*, 512 U.S. at 161)).

Here, Champagne requested that the trial court provide a *Simmons* instruction and the trial court did just that. Given that the statement at issue occurred during voir dire and the sentencing jury was fully and correctly advised that Champagne was ineligible for parole, no *Simmons* error occurred.

¶27        Moreover, in their closing arguments during the penalty phase, both the prosecution and defense emphasized that, if sentenced to life, Champagne would never get out of prison because he was already serving over a 700-year sentence. Thus, contrary to Champagne's assertions, this case is not one in which the jury "was given a false choice between an un-releasable death sentence and the prospect that if given life [Champagne] could just be cut loose, set free, released in a mere 25 years." Instead, there was no risk that the jury believed that, absent a death sentence, Champagne could be released from prison because the jury received a proper instruction that Champagne was ineligible for parole and counsel repeatedly affirmed that he would never be released from prison. Therefore, no error occurred.

### C.  Statements to Detective Egea

¶28        Champagne asserts that the trial court abused its discretion and violated his constitutional rights by refusing to suppress incriminating statements made to an undercover police detective while Champagne was incarcerated. However, Champagne also contends that the court erred by preventing the jury from hearing a statement he made to the undercover officer after his Sixth Amendment right to counsel attached—one of the very statements Champagne sought to suppress—because the rule of completeness required its admission. We review a trial court's ruling on a motion to suppress evidence for abuse of discretion, *State v. Hall*, 204 Ariz. 442, 451 ¶ 37 (2003), but review purely legal issues and constitutional issues de novo, *State v. Moody* (*Moody II*), 208 Ariz. 424, 445 ¶ 62 (2004). Likewise, a trial court's decision to admit or preclude what would otherwise be inadmissible portions of a statement under the rule of completeness pursuant to Arizona Rule of Evidence 106 is reviewed for abuse of

discretion. *State v. Prasertphong* (*Prasertphong II*), 210 Ariz. 496, 500–01 ¶¶ 20–21 (2005).

### 1. Motion to Suppress

**¶29** Before trial, Champagne moved to suppress statements he made to undercover Detective Egea, arguing that they were made in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, as well as article 2, sections 4, 8, 10, and 24 of the Arizona Constitution. The State responded that Champagne's statements to Egea before initiation of formal charges did not violate any of Champagne's constitutional rights but conceded that Egea's meeting with Champagne on March 19, 2013, violated Champagne's Sixth Amendment right to counsel. The following evidence was presented at the hearing on the motion to suppress.

**¶30** On October 20, 2011, police received an anonymous tip about a double homicide, naming Champagne as a potential suspect. Champagne was arrested for unrelated crimes and taken into custody on March 3, 2012. Champagne was properly read his *Miranda* rights and told he was under arrest. Detective Korus, who was investigating the disappearances of Tapaha and Hoffner, interviewed Champagne about the unrelated crimes. When Korus mentioned the missing persons investigation, Champagne's demeanor changed, and he asked, "[d]o I need a lawyer or something?" Korus responded, "[y]ou tell me." But when Korus continued to reference the missing persons, Champagne said, "if you have any more questions about that, I want a lawyer present." Korus immediately ceased questioning Champagne regarding Tapaha and Hoffner.

**¶31** In October 2012, Detective Korus approached Detective Egea, an experienced undercover officer, about "befriending" Champagne while he was incarcerated for the unrelated crimes and seeking information about Champagne's involvement in the missing persons case and the location of the bodies. They decided Egea would go undercover as an unscrupulous private investigator named "Chino." A gang member incarcerated with Champagne told investigators that Champagne admitted killing two people. At the request of law enforcement, the gang member thereafter told Champagne about Chino and arranged a meeting between the two so Chino could "help [Champagne] with whatever problem he may have."

¶32　　　　Detective Egea, undercover as Chino, met with Champagne seven times from October 2012 to March 2013.  On October 23, Champagne told Egea, "I got bigger problems.  I got some buried assets I need relocated."  On October 30, Champagne gave Egea a police report authored by Detective Korus regarding the missing persons, stating, "[t]his is my problem, know what I mean?"  Champagne also said, "[h]ey, Chino, it's going to be a big mess."  On February 14, 2013, Champagne again alluded to the missing persons and indicated that their remains needed to be moved.  On March 4, Champagne told Egea that if the police found the bodies "he would face the death penalty because of his criminal past."  The bodies were found the next day and the State charged Champagne with the murders of Tapaha and Hoffner on March 8.

¶33　　　　Detective Egea visited Champagne on March 19, the only visit that occurred after Champagne was indicted for the charges in this case.  During that visit, Champagne told Egea that the female victim was a prostitute and the male victim her pimp.  He claimed that he lent them his apartment for a few hours and when he returned home they were dead.  According to Champagne, the pimp killed the prostitute and then committed suicide.  Champagne also told Egea that despite the charges, "he didn't think they had a death penalty case on him."

¶34　　　　Following the evidentiary hearing, the trial court granted in part Champagne's motion to suppress statements to Detective Egea, ruling that Champagne's statements on March 19 violated his Sixth Amendment right to counsel and were therefore inadmissible.  The court held that Champagne's Sixth Amendment right to counsel attached on March 8, when he was charged with the murders.  As such, the court found that the State obtained Champagne's statements before March 8 without violating his Sixth Amendment right to counsel.  Additionally, the court ruled that no *Miranda* violation occurred and that Champagne's statements were voluntary.  Champagne challenges those rulings here.

### a. Fifth Amendment

¶35　　　　The trial court properly ruled that no *Miranda* violation occurred.  *Miranda* is not implicated when a suspect—unaware that he is speaking to a law enforcement officer—provides a voluntary statement because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990).

12

Champagne did not know he was speaking to Detective Egea, an undercover officer. Rather, Champagne believed he was speaking to Chino, a corrupt private investigator willing to engage in criminal activity. Because Champagne was unaware that he was speaking to a detective, there was no "police-dominated atmosphere" requiring a *Miranda* warning.

¶36 Champagne also argues that he invoked his Fifth Amendment right to counsel on March 3, 2012, when he told Detective Korus he wanted a lawyer if he was going to be questioned about the missing persons. But even if Champagne invoked his right to counsel during his custodial interrogation with Korus, his subsequent statements to Detective Egea did not violate the Fifth Amendment because conversations between suspects and undercover agents "do not implicate the concerns underlying *Miranda*." *Id.* Thus, the trial court properly ruled that no Fifth Amendment violation occurred.

*b. Voluntariness*

¶37 The trial court properly found that the State established by a preponderance of the evidence that Champagne's pre-charging statements to Detective Egea were voluntary. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). And the United States Supreme Court "has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985); *see also Connelly*, 479 U.S. at 163–65 (discussing how "coercive government misconduct," such as "extract[ing] confessions from the accused through brutal torture," and "police overreaching" are "revolting to the sense of justice" and form the backdrop of the Court's involuntary confession jurisprudence).

¶38 The trial court properly concluded that there was nothing coercive about the police conduct at issue here and that the State's conduct was neither shocking nor fundamentally unfair. Detective Egea never suggested he was affiliated with Champagne's legal team; never suggested he was affiliated with any law firm; never carried any police reports, files, or court documents with him; never discussed Champagne's cases with

him related to the crimes he was incarcerated for at the time; never suggested he could pass along information to Champagne's legal team; and never suggested their conversations would be confidential.

**¶39** The nature of Detective Egea's undercover work was not, as Champagne maintains, "an improper scheme" or "the product of police misconduct that ought to shock the conscience." Champagne believed he was talking to a corrupt investigator who would help conceal two murders by relocating human remains. No constitutional protections exist for "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *See United States v. Henry*, 447 U.S. 264, 272 (1980) (internal quotation marks omitted). Thus, the trial court properly ruled that Champagne's pre-charging statements to Egea were voluntary.

### c. Sixth Amendment

**¶40** Champagne argues that all his statements to Detective Egea violated his Sixth Amendment right to counsel because he invoked that right on March 3, 2012, during his custodial interrogation with Detective Korus. But the Sixth Amendment right to counsel is offense-specific, such that "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991) (internal quotation marks omitted). And "the continuing investigation of *uncharged offenses* d[oes] not violate [a] defendant's Sixth Amendment right to the assistance of counsel." *Arizona v. Roberson*, 486 U.S. 675, 685 (1988) (emphasis added).

**¶41** For the charges related to Tapaha and Hoffner, Champagne's Sixth Amendment right to counsel attached on March 8, 2013, when he was formally charged with their murders. Thus, the trial court properly excluded the statements Champagne subsequently made to Detective Egea on March 19, but also correctly admitted the statements made before March 8.

### 2. Rule of Completeness

**¶42** Although the trial court correctly excluded Champagne's March 19, 2013 statements, during trial Champagne sought to introduce his

statement to Detective Egea from that date stating that "he didn't think they had a death penalty case on him," to rebut his March 4, 2013 statement that if police found the bodies "he would face the death penalty because of his criminal past." According to Champagne, the State "opened the door" to the statement under Arizona Rule of Evidence 106 during its direct examination of Egea.

¶43 The trial court denied Champagne's request, ruling that Rule 106 did not apply and that the statement on March 19 did not complete his statement on March 4. The court emphasized that, based on the parties' agreement, evidence from the meeting between Champagne and Detective Egea on March 19 was suppressed, and it found under Evidence Rule 403 that allowing a restricted portion of the conversation to be admitted out of context would confuse and mislead the jury. Champagne argues now that because the trial court failed to admit his statement from March 19, "the jury likely thought [he] was all but confessing to murder," and that the "complete statement was necessary to put the remainder, which the [S]tate had introduced, into context." According to Champagne, the State was permitted to "cherry-pick what it thought was incriminating and leave out the complete statement that explained what Mr. Champagne actually said." The trial court did not abuse its discretion.

¶44 Rule 106—the rule of completeness—provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." The same rule generally applies to non-recorded statements. *See State v. Powers*, 117 Ariz. 220, 226 (1977). The rule is one of inclusion not exclusion: if one party introduces part of a recorded statement, an adverse party may require concurrent introduction of other parts of that statement to ensure fairness, "thereby 'secur[ing] for the tribunal a complete understanding of the total tenor and effect of the utterance.'" *State v. Steinle*, 239 Ariz. 415, 418 ¶ 10 (2016) (alteration in original) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171 (1988)). But "[p]ermitting testimony related to an *entirely separate conversation* does nothing to complete the other conversation." *State v. Huerstel*, 206 Ariz. 93, 104 ¶ 38 (2003) (emphasis added).

¶45 The statement Champagne sought to introduce was not needed to complete a statement already introduced, to avoid the introduced

statement from being taken out of context, or to prevent jury confusion. Rather, it was a separate statement from an entirely separate conversation that occurred on a separate date. That Champagne made contradictory statements fifteen days apart does not somehow make those two statements one continuous utterance. Indeed, Champagne wanted the March 19 conversation excluded but sought to use a snippet from it out of context to rebut his statement from March 4. Thus, the trial court properly ruled that Rule 106 did not apply under these circumstances.

¶46        Moreover, the trial court acted within its discretion in precluding Champagne's March 19 statement under Rule 403. The court properly ruled that admitting the statement from the March 19 conversation would "simply be confusing" and "mislead" the jury, such that the statement should be excluded under Rule 403. *Cf. Prasertphong II*, 210 Ariz. at 501 ¶ 21 (concluding "the rule of completeness confers upon trial judges the discretion to admit the remaining portions of a statement if the redacted portion of the statement may mislead the jury").

### D. Limited Cross-Examination of Garcia

¶47        Champagne argues that the trial court abused its discretion by refusing to permit him to confront and cross-examine Garcia about her mental illness diagnoses. "We review limitations on the scope of cross-examination for abuse of discretion." *State v. Delahanty*, 226 Ariz. 502, 506 ¶ 17 (2011).

¶48        Champagne and Garcia were initially charged as co-defendants in this case, but Garcia ultimately accepted a plea deal whereby she agreed to testify against Champagne. Before trial, the State moved in limine to preclude any questioning regarding, among other things, Garcia's mental health diagnoses. Champagne maintained that Garcia's diagnoses of bipolar disorder, post-traumatic stress disorder, and depression spoke to her mental state and her ability to perceive events accurately, as did the fact that she was not medicated for those disorders and was drinking alcohol and using methamphetamine before the crimes occurred.

¶49        At oral argument on the motion in limine, the State conceded that Garcia's drug use was relevant to her ability to perceive the events surrounding the murders but argued that her mental health diagnoses were

irrelevant.  The trial court subsequently granted in part and denied in part the State's motion in limine.  As relevant here, the court stated:

> Defendant has not demonstrated either the existence of, or whether or how, any mental health diagnosis may affect the witness'[s] ability to observe or perceive the events to which she may testify.  Moreover, the Court has not heard any evidence to support that the mere fact that Ms. Garcia has a mental health diagnosis . . . affects [her] credibility or capacity to recall or communicate.  Therefore, the Court finds that evidence of Ms. Garcia's mental health diagnoses lacks relevance in this case and that any probative value is substantially outweighed by the unfair prejudice.  Of course, the witness may be cross-examined regarding her ability to perceive, observe, or recall the events to which she testifies; however, the Court will not allow cross-examination regarding the mere fact that Ms. Garcia was diagnosed with any particular mental health diagnosis.

(Citations omitted.)

¶**50**        The court allowed Champagne limited inquiry into Garcia's ability to perceive, observe, and recall the events.  The court invoked Rule 403 to preclude Champagne from asking whether prescription medication Garcia was taking during trial was mental health medication because Champagne failed to present sufficient evidence suggesting a connection between any medication and her ability to recall and observe the matters to which she testified.  The court permitted Champagne to question Garcia regarding the fact that in June 2011 she was prescribed medication and that she was not taking that medication, as well as her perception of the effect, if any, of her failure to take such medication.

¶**51**        During her direct examination, Garcia admitted that her methamphetamine use made it difficult for her to remember details but not major events, and she maintained that she never experienced hallucinations while using methamphetamine.  Additionally, Garcia acknowledged that methamphetamine use affected her memory, that she was taking methamphetamine and not her prescribed medication during the summer of 2011, and that she used methamphetamine the night before the murders.

17

¶52 The trial court did not abuse its discretion in limiting Champagne's cross-examination of Garcia regarding her mental health. This Court has long held that "great latitude should be allowed in the cross-examination of an accomplice or co-defendant who has turned State's evidence and testifies on behalf of the State on a trial of his co-defendant." *State v. Morales*, 120 Ariz. 517, 520 (1978) (internal quotation marks omitted). Improper denial of the right of effective cross-examination results in "constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Davis v. Alaska*, 415 U.S. 308, 318 (1974) (quoting *Brookhart v. Janis*, 384 U.S. 1, 3 (1966)). And "if the trial judge has excluded testimony which would clearly show bias, interest, favor, hostility, prejudice, promise or hope of reward, it is error and will be ground for a new trial." *State v. Holden*, 88 Ariz. 43, 55 (1960) (citations omitted).

¶53 Evidence of a witness's mental health history may be admissible when it speaks to his or her credibility. *See Delahanty*, 226 Ariz. at 506 ¶ 18. However, recognizing that many psychiatric conditions do not affect a witness's credibility or his or her ability to observe and communicate, this Court has held that a trial court may exclude the mental health history of a witness under Rule 403 "unless the proponent 'make[s] an offer of proof showing how it affects the witness's ability to observe and relate the matters to which he testifies.'" *Id.* (alteration in original) (quoting *State v. Zuck*, 134 Ariz. 509, 513 (1982) (upholding exclusion of evidence of paranoid schizophrenia when defense counsel failed to show witness's diagnosis affected his ability as a witness)). Before psychiatric history may be admitted to impeach a witness on cross-examination, "the proponent of the evidence *must* make an offer of proof showing how it affects the witness's ability to observe and relate the matters to which he testifies." *Zuck*, 134 Ariz. at 513 (emphasis added).

¶54 Here, Champagne failed to show that Garcia's ability to observe and relate the events surrounding the murders was affected in any way by her mental health diagnoses or her failure to take medication for those diagnoses. Champagne's only offer of proof was conclusory statements that Garcia's mental health diagnoses lessened her ability to perceive and remember events. In fact, Champagne's counsel admitted at trial that the defense did not intend to offer any testimony linking Garcia's mental health diagnoses and her ability to perceive and recall the events

surrounding the murders. Because Champagne failed to show how Garcia's mental health diagnoses affected her ability to observe and relate the matter to which she testified, the trial court did not abuse its discretion in limiting Champagne's cross-examination of Garcia under Rule 403.

¶55 Nor did the trial court's limitation of Champagne's ability to cross-examine Garcia about her mental health diagnoses and prescribed medications for those diagnoses deprive him of his constitutional right to confront the witnesses against him. *See* U.S. Const. amend. VI. Garcia was thoroughly cross-examined about her ability to perceive and relate the events surrounding the murder, her credibility, her drug usage and how it affected her ability to remember events, and about prescription medication she was supposed to be taking in 2011. And she admitted that her use of methamphetamine impacted her memory. Garcia was also extensively cross-examined about the benefits she was receiving from her plea deal and her agreement to testify against Champagne. Thus, the court did not deprive Champagne of his right to confront Garcia or his ability to defend against the charges.

### E. Voluntary Intoxication Jury Instruction

¶56 Champagne contends the trial court erred in providing the jury with a voluntary intoxication jury instruction, which he characterizes as an "unrequested affirmative defense," prejudicing him and making it seem that he had admitted the murders but was claiming intoxication as an excuse. We review a trial court's decision to give or refuse a requested jury instruction for abuse of discretion. *State v. Dann*, 220 Ariz. 351, 363–64 ¶ 51 (2009). And we review de novo whether the jurors were properly instructed. *Id.* at 364 ¶ 51.

¶57 During trial, Garcia testified that she and Champagne frequently got high on methamphetamine together, including the night before the murders. When finalizing the guilt phase jury instructions, the State requested an instruction that voluntary intoxication is not a defense to any criminal act. Champagne objected, contending that such an instruction would confuse and mislead the jurors. Specifically, he asserted that he was not arguing he lacked the mens rea to commit the murders due to intoxication. The State countered that the jurors needed the instruction to understand what impact evidence of methamphetamine usage should have on their deliberations and consideration of the evidence.

**¶58** Relying on *State v. Payne*, 233 Ariz. 484 (2013), the court gave the following voluntary intoxication instruction: "It is not a defense to any criminal act if the criminal act was committed due to the temporary intoxication resulting from the voluntary ingestion, consumption, inhalation, or injection of alcohol or illegal substances." *See id.* at 517–18 ¶¶ 149–50. Champagne argues that this instruction deprived him of due process and a properly instructed jury because the trial court instructed the jury on an affirmative defense that he did not raise.

**¶59** As a preliminary matter, Champagne's contention that the trial court erred in giving the voluntary intoxication instruction because "intoxication is an affirmative defense" fails as a matter of law. Our legislature abolished all common law affirmative defenses, *see* A.R.S. § 13-103(A), and, on its face, A.R.S. § 13-503 clearly provides that voluntary intoxication caused by use of illegal drugs is not a defense. § 13-503 ("Temporary intoxication resulting from the voluntary ingestion, consumption, inhalation or injection of alcohol, an illegal substance . . . or other psychoactive substances or the abuse of prescribed medications does not constitute insanity and is *not a defense* for any criminal act or requisite state of mind." (emphasis added)).

**¶60** Additionally, parties are "entitled to an instruction on any theory of the case reasonably supported by the evidence." *State v. Bolton*, 182 Ariz. 290, 309 (1995). There was extensive testimony at trial that Champagne was drinking and high on methamphetamine before the murders. The State persuasively argues that without the voluntary intoxication instruction the jury could have rejected Champagne's claim of innocence but improperly concluded that his voluntary intoxication prevented him from forming the necessary intent for criminal liability.

**¶61** Moreover, Champagne's argument that the instruction implied to the jury that he admitted committing the murders is baseless. Instead, the instruction told the jury that if Champagne committed any criminal act, voluntary intoxication was not a defense. And contrary to Champagne's contention, the instruction did not prejudicially communicate to the jury that the court believed Champagne was guilty. Rather, the instruction simply advised the jury of the law. Therefore, no error occurred.

### F. Supplemental Closing Argument

¶62        Champagne argues that the trial court erred in permitting the State to make additional closing argument during the guilt phase after the jury interrupted deliberations to ask a question. We review a trial court's response to a jury question for abuse of discretion. *State v. Ramirez*, 178 Ariz. 116, 126 (1994).

¶63        Although the trial court provided a standard felony murder jury instruction, the jury submitted the following question during deliberations: "Can we get a more detailed explanation of felony murder?" The court expressed to counsel that it was inclined to give each side five minutes to further argue their position on felony murder. Champagne's counsel strenuously objected, arguing that the court should simply refer the jurors to the existing jury instructions. Additionally, Champagne's counsel expressed fear that "further argument [would] invade the province of the jurors and actually interfere with their jury deliberations."

¶64        Relying on *State v. Patterson*, 203 Ariz. 513 (App. 2002), *remanded for reconsideration on other grounds*, No. CR-03-0007-PR, 2003 WL 21242145 (Ariz. May 28, 2003), and *State v. Fernandez*, 216 Ariz. 545 (App. 2007), the court ordered supplemental argument, permitting each side five minutes to respond to the jury's question. The prosecutor briefly reviewed the elements of felony murder, the jury instructions the court provided concerning that charge, and how the evidence of the kidnapping and murder of Hoffner established felony murder. Champagne waived supplemental argument, relying on his closing argument. The jury resumed deliberations, later returning a guilty verdict for the first-degree murder of Hoffner, unanimously finding both premeditated murder and felony murder.

¶65        Arizona Rule of Criminal Procedure 22.3(b) provides that if a jury requests additional instruction after it has retired for deliberations, "the court may recall the jury to the courtroom and further instruct the jury as appropriate." Similarly, Rule 22.4 provides that if the jury informs the court that it has reached an impasse, "the court may . . . ask the jury to determine whether and how the court and counsel can assist the jury's

deliberations" and "direct further proceedings as appropriate." The comment to Rule 22.4 states:

> Many juries, after reporting to the judge that they have reached an impasse in their deliberations, are needlessly discharged and a mistrial declared even though it might be appropriate and helpful for the judge to offer some assistance in hopes of improving the chances of a verdict. The judge's offer would be designed and intended to address the issues that divide the jurors, if it is legally and practically possible to do so. The invitation to dialogue should not be coercive, suggestive, or unduly intrusive.

Although this Court has never addressed whether a trial court can permit supplemental argument after jury deliberations begin to resolve jury confusion absent an impasse, we agree with the outcomes in *Fernandez* and *Patterson*. *See Fernandez*, 216 Ariz. at 550–52 ¶¶ 14, 16–17 (finding that although jury was not at an impasse when it asked for a more expansive definition regarding premeditation, the trial court's order directing supplemental argument was not an abuse of discretion but "consistent with more general rules governing the conduct of a trial and assistance to the jury during deliberations"); *Patterson*, 203 Ariz. at 515 ¶ 10 (holding that even where jury is not at an impasse, the trial court has broad discretion to "fully and fairly respond" to its queries).

**¶66** Rule 22.4 provides what the court *may* do upon an impasse. But it does not exhaust the possible responses a trial court may make to jury questions, and indeed by its terms applies only when an impasse exists. Here, Rule 22.3 applies as the jury requested additional information after retiring for deliberations without an impasse. Rule 22.3(b) provides that in such a situation "the court *may* recall the jury to the courtroom and further instruct the jury *as appropriate*." (Emphasis added.)

**¶67** Trial courts have inherent authority to assist juries and respond to jury requests for additional instructions during deliberations even when a jury is not at an impasse. *See* Ariz. R. Crim. P. 1.2 (providing that the rules of criminal procedure are to be construed "to secure simplicity in procedure, fairness in administration, the elimination of unnecessary delay and expense, and to protect the fundamental rights of the individual while preserving the public welfare"). Trial judges should fully and fairly

respond to requests from deliberating juries when it is clear they are confused by the provided instructions. *See Patterson*, 203 Ariz. at 515 ¶ 10 & n.3. Doing so may prevent needlessly discharging juries and prematurely declaring mistrials in circumstances where it might be appropriate and helpful for judges to offer assistance. However, we emphasize that a trial court should not order supplemental argument after a jury retires for deliberations unless the court concludes additional argument is the only way to adequately respond to the jury's request for additional instruction without inappropriately commenting on the evidence or prejudicing the parties' rights.

**¶68** Here, the trial court was justified in permitting counsel to present additional argument. The jury's question indicated that it was struggling with the definition of felony murder and needed clarification on the law despite the court's standard instruction on that charge. Given the jury's confusion in the face of a straight-forward instruction, referral to that instruction would have been useless. Presentation of supplemental argument was an effective and efficient way to ensure a fair verdict without risk of jury coercion. Although we encourage trial judges to make findings explaining why they chose not to refer the jury to an original instruction or further instruct the jury, the trial court here did not abuse its discretion in permitting supplemental argument to resolve the jury's confusion.

**¶69** Even if permitting supplemental argument was error, it was clearly harmless. "Error, be it constitutional or otherwise, is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict." *State v. Anthony*, 218 Ariz. 439, 446 ¶ 39 (2008) (internal quotation marks omitted). "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.* (alteration in original) (internal quotation marks omitted). Here, the jury unanimously found Champagne guilty of the first-degree premeditated murder of Hoffner, so any error resulting from the court permitting supplemental closing argument on felony murder was tangential at most to the outcome and therefore harmless.

### G. Arizona's Death Penalty Scheme

¶70 Champagne argues that the trial court erred in refusing to dismiss the § 13-751(F)(6) aggravating circumstance and failing to strike the entire Arizona death penalty scheme as unconstitutional. Specifically, Champagne contends that the (F)(6) aggravator is unconstitutionally vague and the death penalty scheme violates *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam). We review de novo constitutional claims, *State v. Ovante*, 231 Ariz. 180, 185 ¶ 18 (2013), including the constitutionality of aggravating factors, *State v. Forde*, 233 Ariz. 543, 569 ¶ 105 (2014).

### 1. Death Penalty Scheme

¶71 Before trial, Champagne made several constitutional objections to Arizona's entire death penalty scheme. Here, Champagne makes no argument warranting a departure from this Court's precedents upholding the constitutionality of the Arizona death penalty scheme. Champagne contends that scheme violates *Furman*, a nearly fifty-year-old opinion in which the United States Supreme Court effectively struck down all death penalty schemes in the United States. 408 U.S. at 239–40; *see* Carol S. Steiker & Jordan M. Steiker, *Sober Second Thoughts: Reflections on Two Decades of Constitutional Regulation of Capital Punishment*, 109 Harv. L. Rev. 355, 357 (1995). But a few years later in *Gregg v. Georgia*, the Court ended the de facto moratorium on capital punishment, noting that "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." 428 U.S. 153, 195 (1976) (plurality opinion).

¶72 Champagne's argument that the Arizona death penalty scheme violates the Eighth and Fourteenth Amendments of the United States Constitution, as well as article 2, sections 4 and 15 of the Arizona Constitution, is based on his contention that "A.R.S. § 13-751 concededly provides no path to meaningfully distinguish the few cases in which death is deserved from the many which do not." Indeed, "[t]o be constitutionally sound, 'a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *State v. Hidalgo*, 241 Ariz. 543, 549 ¶ 14 (2017) (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988)). Champagne

24

essentially contends that Arizona's death penalty scheme does not satisfy that requirement. But we rejected a similar challenge in *State v. Greenway*, 170 Ariz. 155, 160 (1991), and more recently in *Hidalgo*, 241 Ariz. at 549–52 ¶¶ 14–29. For the reasons expressed in *Hidalgo*, we likewise reject Champagne's arguments here.

## 2. A.R.S. § 13-751(F)(6)

**¶73** Before trial, Champagne moved to dismiss the § 13-751(F)(6) aggravating factor, arguing that factor is unconstitutional. Champagne later moved to strike the State's allegations of an aggravating circumstance under § 13-751(F)(6), arguing that the parameters of the (F)(6) aggravating factor have been created by the Arizona judiciary and therefore violate separation of powers. The trial court rejected Champagne's motions.

**¶74** In its preliminary and final aggravation phase jury instructions, the trial court noted that all first-degree murders are "to some extent cruel." The court defined "especially" as "unusually great or significant," and noted "[t]he term 'cruel' focuses on the victim's pain and suffering." The court instructed that in order to find a first-degree murder was committed in an especially cruel manner, the jury "must find that the victim consciously suffered physical or mental pain, distress or anguish prior to death" and that "[t]he defendant must know or should have known that the victim would suffer."

**¶75** Section 13-751(F)(6) provides that the trier of fact shall consider whether "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner" as an aggravating circumstance in determining whether to impose a death sentence. This Court has held that "[t]he (F)(6) aggravator is facially vague but may be remedied with appropriate narrowing instructions." *State v. Tucker*, 215 Ariz. 298, 310 ¶ 28 (2007). And we have approved of "especially cruel" instructions that require the jury to find two essential narrowing factors: "the victim was conscious during the mental anguish or physical pain" and "the defendant knew or should have known that the victim would suffer." *Id.* at 310–11 ¶ 31 (citing cases).

**¶76** Here, the trial court's instructions to the jury were not unconstitutionally vague. The court properly instructed the jury that to find the (F)(6) aggravating circumstance, the jury "must find that the victim

consciously suffered physical or mental pain, distress or anguish prior to death" and that the "defendant must know or should have known that the victim would suffer." Because the instruction included the two essential narrowing factors described in *Tucker*, the trial court sufficiently narrowed the (F)(6) factor, rendering it constitutional. *See State v. Sanders*, 245 Ariz. 113, 126 ¶ 43 (2018); *Tucker*, 215 Ariz. at 310–11 ¶¶ 28, 31.

**¶77** Likewise, Champagne's contention that this Court violated the separation of powers doctrine by narrowing the (F)(6) aggravator to render it constitutional is meritless. *See State v. Tocco*, 156 Ariz. 116, 119–20 (1988) ("We are charged with the responsibility of giving a statute a constitutional construction whenever possible. Nor is it our responsibility to declare invalid for vagueness every statute which we believe could have been drafted with greater precision." (citation omitted)). We have previously rejected the argument that the legislature must statutorily narrow the scope of death-eligible murders. *Hidalgo*, 241 Ariz. at 549–52 ¶¶ 17–28; *cf. Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (rejecting the claim that "Arizona does not properly narrow the class of death penalty recipients"). As such, the trial court did not err in instructing the jury on the (F)(6) aggravator.

## H. Mitigation Issues

### 1. Mitigation Testimony

**¶78** Champagne argues that the trial court abused its discretion in preventing his mother and sister from providing mitigation evidence during the trial's penalty phase after they indicated they would invoke their Fifth Amendment privileges if called to testify. We review a trial court's ruling on admission of mitigating evidence for abuse of discretion. *See Payne*, 233 Ariz. at 518 ¶ 153. And we also review a trial court's decision to preclude the testimony of a witness intending to assert her Fifth Amendment privilege against self-incrimination for abuse of discretion. *State v. Harrod*, 218 Ariz. 268, 275–76 ¶ 19 (2008).

**¶79** Before trial, the State requested that the trial court appoint counsel for Champagne's mother and sister after discovering jail calls suggesting they were involved in hiding the victims' bodies after the murders. Champagne did not object to such appointments, but counsel expressed concern that, if his mother's and sister's attorneys advised them

to remain silent and not participate in the trial, that would "eviscerate approximately 25 percent of the possible mitigation evidence." The court granted the State's request and appointed counsel for Champagne's mother and sister.

¶80 The court heard oral argument on the parties' numerous motions regarding the testimony of Champagne's mother and sister. When the prosecutor proffered the topics the State intended to cross-examine the witnesses about, Champagne's mother and sister, as well as their attorneys, maintained that they would invoke their Fifth Amendment rights to silence if questioned by the State during the guilt and penalty phases. The court ruled that Champagne's mother and sister both had a valid Fifth Amendment right to remain silent in response to any questions asked during the guilt and penalty phases involving their connection to or involvement with Champagne.

¶81 Additionally, considering the position taken by Champagne's mother and sister—that they would answer questions asked by defense counsel but invoke the Fifth Amendment in response to any of the State's questions on cross-examination—the court found that preclusion of their testimony entirely was the necessary result to the State's inability to cross-examine the witnesses. The court noted the unusual nature of the case but emphasized that "if allowed to testify, the witnesses would answer questions on direct by Defense and invoke to all questions asked by the State, thus placing the Court in the virtually certain position of striking their testimony and instructing the jury to disregard anything either witness said." The court also emphasized that its order precluding the witnesses' testimony did not strip Champagne of his ability to present the identified mitigation evidence through his mitigation witness in place of his mother and sister.

¶82 Defendants in capital cases are entitled to present mitigation evidence and, pursuant to § 13-751(C), "the prosecution or the defendant may present *any* information that is relevant to any of the mitigating circumstances . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials." (Emphasis added.) But although defendants have a right to offer the testimony of witnesses to present a defense and, if necessary, to compel their attendance, *Washington v. Texas*, 388 U.S. 14, 19 (1967), that right, guaranteed by the Sixth Amendment, is not absolute, *Harrod*, 218 Ariz. at 276 ¶ 20.

**¶83**        This Court has held that if the trial court determines that a witness legitimately could refuse to answer essentially all relevant questions, "then that witness may be totally excused without violating an individual's Sixth Amendment right to compulsory process." *Harrod*, 218 Ariz. at 276 ¶ 20 (internal quotation marks omitted). But this exception is a narrow one that is only applicable "when the trial judge has extensive knowledge of the case and rules that the Fifth Amendment would be properly invoked in response to all relevant questions that the party calling the witness plans on asking." *Id.* ¶ 21 (internal quotation marks omitted). Moreover, the United States Supreme Court has held that "[i]t is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Mitchell v. United States*, 526 U.S. 314, 321 (1999). Precluding such testimony is necessary because "[a] witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry." *Id.* at 322.

**¶84**        In determining whether to allow a witness to testify and invoke her right to remain silent in the presence of the jury, "[t]he correct rule . . . is that if the court finds that the [F]ifth [A]mendment will be properly invoked, it has discretion to determine whether to allow the proponent of the evidence to call the witness and elicit the claim of privilege before the jury." *State v. Corrales*, 138 Ariz. 583, 588 (1983). And the court may refuse to permit the witness to be called entirely "if it finds that the benefits to be gained will be outweighed by the danger of prejudice." *Id.* at 588–89.

**¶85**        Here, the trial court had intimate knowledge of the case and determined—after extensive briefing on the issues, oral argument, and examining the potential witnesses—that Champagne's mother and sister could legitimately invoke their Fifth Amendment rights to remain silent in response to all relevant questions the State intended to ask during cross-examination. Because Champagne's right to present mitigation does not permit his witnesses to selectively invoke the Fifth Amendment privilege, the trial court acted within its discretion in precluding them from testifying. *See Harrod*, 218 Ariz. at 276 ¶¶ 22–23.

**¶86**        Moreover, as the trial court noted in its ruling, precluding Champagne's mother and sister from testifying as mitigation witnesses did

not prevent Champagne from presenting the same mitigation evidence through his investigator. Champagne's investigator testified for over three days and presented a 198-slide PowerPoint beginning with Champagne's birth and extensively detailing his childhood and background. Champagne has failed to identify any specific information that he was barred from presenting by the trial court's ruling. Consequently, no error or prejudice occurred.

## 2. Mitigation Rebuttal

**¶87** Champagne contends the trial court abused its discretion by permitting inappropriate, inadmissible mitigation rebuttal by the State such that a mistrial should have been declared. We review a trial court's denial of a motion for a mistrial for abuse of discretion. *Payne*, 233 Ariz. at 504 ¶ 61. Likewise, we review a trial court's admission of evidence during the penalty phase for abuse of discretion, *State v. Nordstrom*, 230 Ariz. 110, 114 ¶ 8 (2012), giving "deference to a trial judge's determination of whether rebuttal evidence offered during the penalty phase is 'relevant' within the meaning of the statute," *State v. McGill*, 213 Ariz. 147, 156–57 ¶ 40 (2006). "The threshold for relevance is a low one." *State v. Leteve*, 237 Ariz. 516, 529 ¶ 48 (2015) (internal quotation marks omitted).

**¶88** Before trial, Champagne moved to preclude the State from offering any rebuttal evidence not specifically related to his proffered mitigation evidence. Citing *Leteve*, 237 Ariz. at 528–29 ¶ 47, the trial court ruled that the State's mitigation rebuttal would be admitted so long as it was "relevant to show that the defendant should not be shown leniency and [wa]s not unfairly prejudicial."

**¶89** During the penalty phase, "the defendant and the state may present any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency." A.R.S. § 13-752(G). And to assist the trier of fact in making that determination, "*regardless of whether the defendant presents evidence of mitigation*, the state may present *any* evidence that demonstrates that the defendant should not be shown leniency including any evidence regarding the defendant's character, propensities, criminal record or other acts." *Id.* (emphasis added). This Court has repeatedly held that, taken together, the statutes governing the scope of mitigation rebuttal—§ 13-751(G) and § 13-752(G)— "permit jurors to hear evidence relating to circumstances of the crime and

the defendant's character, which they must do to fulfill their 'duty to evaluate all the relevant evidence when determining the defendant's sentence.'" *See, e.g.*, *State v. Guarino*, 238 Ariz. 437, 440 ¶ 13 (2015) (quoting *State v. Carlson*, 237 Ariz. 381, 396 ¶ 54 (2015)).  But we have also stated that due process constrains the admission of the state's evidence during the penalty phase, including evidence that is unduly prejudicial.  *Id.* at 441 ¶ 15.

**¶90**        Champagne contends that only rebuttal evidence relevant to his proffered mitigation was admissible at trial, but the text of § 13-752(G) clearly permitted the State to present *any* evidence to demonstrate that Champagne should not be shown leniency.  During the penalty phase, Champagne presented mitigation evidence seeking to reduce his moral culpability because of his family background, his childhood exposure to gangs, and his involvement with the criminal justice system beginning at age fifteen.  The court properly permitted the State to proffer evidence to argue that he should not be shown leniency.

### a.  Prior Convictions

**¶91**        During the penalty phase, Champagne objected to any testimony about his previous convictions.  Those convictions included a second-degree murder Champagne committed in 1991 and twenty-four counts each of attempted first-degree murder and aggravated assault of a police officer using a deadly weapon Champagne committed in 2012 when he took Garcia and his young son hostage and engaged in a shootout with police.  Champagne argued then, and maintains now, that such evidence did not rebut his mitigation.  However, the trial court properly overruled his objections because the 1991 murder and 2012 shootout demonstrated Champagne's character, propensities, and criminal record.  "The facts establishing an aggravating circumstance, or the circumstances of the murder more generally, 'are relevant during the penalty phase because they tend to show whether the defendant should be shown leniency.'"  *Guarino*, 238 Ariz. at 440 ¶ 13 (quoting *State v. Armstrong*, 218 Ariz. 451, 461 ¶ 38 (2008)).

### b.  Detective Korus

**¶92**        Detective Korus narrated a video that Champagne's neighbor took of gang graffiti on the walls of Champagne's apartment after he was evicted, which was offered to demonstrate, for character purposes,

Champagne's affiliation with the East Side Locos 13th Street gang. Additionally, Korus's testimony regarding the events that occurred during the shootout case, including narrating video footage from the crime scene, constituted proper mitigation rebuttal. Facts underlying a prior criminal conviction are relevant to show that a defendant is not entitled to leniency and may be properly admitted when not unduly prejudicial. *See, e.g.*, *State v. Pandeli*, 215 Ariz. 514, 528–29 ¶¶ 51–53 (2007). Korus's testimony was relevant and not unduly prejudicial because it simply explained facts that occurred during the shootout case and identified Champagne's gang affiliation.

### c. Detective Morales

**¶93** Detective Morales, the case agent for the 1991 murder referenced above, testified about the details of Champagne's second-degree murder conviction for that crime. Morales testified that Champagne, who had been huffing paint, ingesting LSD, and drinking alcohol, and another member of the East Side Locos 13th Street gang arrived at a house party with knives and eventually they were "swinging wildly at people . . . stabbing people . . . total melee." Morales testified that Champagne murdered a "clean-cut" only child—a nineteen-year-old man with no criminal record or gang ties—by stabbing him through the heart and skull, and that the victim had numerous defensive wounds. Additionally, Morales testified that Champagne fled the scene and hid in Nevada and California before he was found three months later. Morales noted that the presentence report demonstrated that Champagne had failed on probation and "posed an unreasonable risk and danger to the community," dating back to 1991. The trial court did not abuse its discretion in finding this testimony was relevant mitigation rebuttal and not unduly prejudicial because Morales simply provided details about the crime scene, the victim's injuries, Champagne's fleeing from the scene, and other details about the conviction.

### d. Attempted Plea Withdrawal

**¶94** The State presented mitigation rebuttal, over Champagne's objection, that he attempted to withdraw his plea for the 1991 murder. The court did not abuse its discretion by allowing such evidence, as it was relevant to Champagne's character and not unduly prejudicial.

### e. Detective Davis

¶95        Detective Davis testified that one of Champagne's fellow inmates informed law enforcement that Champagne was seeking approval from the Mexican Mafia, with which Champagne was affiliated, to hurt or kill Garcia to prevent her from testifying against him.  Evidence that Champagne took steps to silence Garcia was relevant to his character and propensities and rebutted mitigation testimony that there was humanity and good in Champagne.  Contrary to Champagne's assertion that this testimony was inappropriate because the informant inmate was mentally ill, the trial court did not err in permitting the testimony.  And the testimony did not unduly prejudice Champagne because the defense cross-examined Davis on the inmate's mental competency, including his Rule 11 proceedings, and established that Davis never actually met the inmate.

### f. Officers Johnson and Knudson

¶96        Over Champagne's objection, the trial court permitted Officers Johnson and Knudson—who were present at the 2012 shootout incident—to testify about the events they witnessed in their law enforcement capacity.  Knudson testified about how they entered the house, that Garcia was screaming frantically, and that the bullets were coming at them through the walls.  Johnson testified that Champagne was submissive when Johnson restrained him during the breach and that Champagne did not fight back as the officers recovered Garcia.  Additionally, Johnson testified on cross-examination that Champagne said he was "sorry" when he was apprehended, but on re-direct he testified that Champagne never inquired as to whether he injured or killed anyone.  The officers' testimonies were not cumulative because they provided different information about the shootout incident.  Also, contrary to Champagne's assertion, their testimonies were not impermissible victim impact statements but rather statements as factual witnesses.

¶97        Moreover, all the State's proffered evidence of Champagne's 2012 hostage situation and shootout with police was relevant mitigation rebuttal because it demonstrated that Champagne did not value human life and that he intended to kill numerous police officers.  After he was apprehended in the shootout case, Champagne indicated the ammunition in his AR-15 rifle was hollow point, which causes more damage on impact than other types of ammunition.  The specific AR-15 ammunition is known

on the streets as a "cop killer round."  Also, Champagne said he was intentionally shooting at police knowing that his ammunition could go through walls.  Additionally, when Champagne released his son, he used Garcia as a human shield.  When Champagne was apprehended, he never asked if he injured or killed anyone.  Thus, evidence related to the shootout was relevant to Champagne's character and propensity for violence, and it was not unduly prejudicial as it was a factual account of his prior criminal actions.

### g.  Examination of Champagne's Niece

¶98        The State asked Champagne's niece if she had been forced to testify under threat of arrest and, after the defense's objection to her affirmative response, she clarified that she testified subject to subpoena by the defense.  She also indicated that her husband did not want her to testify, and that he wrote multiple letters to the judge, defense, and prosecution begging that she not be forced to testify because it would be "extremely traumatic" for her to speak about her childhood.  The State's questioning of Champagne's niece was appropriate and relevant mitigation rebuttal because the questions went to possible bias of the witness's testimony and why she testified the way she did.  And we reject as baseless Champagne's contention that a mistrial should have been declared because the prosecutor said, "I'm so sorry you are here," thus purportedly implying that the defense had "done something wrong or unsavory."

### h.  Tape of Shootout Case

¶99        During trial, Champagne objected to playing an audio recording of the shootout incident, contending it constituted a retrial of the 2012 case.  The trial court accepted the State's contention that playing the recording provided probative value distinct from the prior testimony by officers at the scene.  But the court thereafter paused the recording when it played Garcia screaming as police entered the house, and the trial court stated to counsel, "[w]e're stepping up to the line of unfairly prejudicial at this point."  When the court asked the State to explain the probative value of the remaining portion of the recording, the prosecution reasoned that it "[c]aptures the crime that [Champagne] committed" and "essentially shows his demeanor as he continues to shoot at the police as they continue to advance."  The trial court decided to preclude the remainder of the recording and found, "we have reached the moment where it is unfairly

prejudicial to continue to hear Ms. Garcia simply scream in agony during this incident."

¶100        The court did not abuse its discretion in admitting the recording because it provided factual details of the prior crime and Champagne's character in a way unique from testimony a witness could provide.  And even if the court abused its discretion in admitting the recording, it was not unduly prejudicial because the court stopped playing the recording when continuing to play it would have become unfairly prejudicial, and because it was admitted by stipulation and thus could be considered by the jury regardless of whether it was played in open court. Thus, the court did not abuse its discretion in permitting the portion of the recording that it did.

¶101        Therefore, contrary to Champagne's arguments, the trial court's admission of the State's mitigation rebuttal did not allow a rehashing of the guilt and aggravation phases.  Rather, the evidence rebutted the thrust of Champagne's mitigation evidence and was relevant to his character, propensities, and criminal record.

## I.  Victim Impact Statements

¶102        Champagne contends that the trial court erred in allowing Hoffner's adopted brother and sister to present victim impact statements because they are not "victim's family."  According to Champagne, because Hoffner's siblings were adopted, "they were not statutory victims" under § 13-752(S)(2) and their impact statements were impermissible.  We review for abuse of discretion a trial court's admission of victim impact evidence. *State v. Benson*, 232 Ariz. 452, 466 ¶ 62 (2013).  And we review de novo issues of statutory interpretation.  *State v. Christian*, 205 Ariz. 64, 66 ¶ 6 (2003).

¶103        No error, fundamental or otherwise, occurred when the court permitted Hoffner's adopted siblings to give victim impact statements. Victims are permitted to provide information during the penalty phase about the murdered person and the impact of the murder on the victim's family.  § 13-752(R).  Victim is defined as "the murdered person's spouse, parent, child, grandparent or *sibling*, any other person related to the murdered person by consanguinity or affinity to the second degree or any other lawful representative of the murdered person."   § 13-752(S)(2) (emphasis added).

¶104 Adopted siblings are clearly "victims" under the statute, and Champagne's argument that adopted siblings are not "statutory victims" belies the plain meaning of the statute and would result in absurd consequences. The statute does not limit "siblings" to blood siblings, and indeed expressly includes relatives by affinity (marriage). Champagne did not raise this spurious argument at trial and he offers no authority to support it now.

### J. Abuse of Discretion Review

¶105 Arizona law requires this Court to "review all death sentences to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." A.R.S. § 13-756(A). We will affirm the jury's finding of aggravating circumstances "if there is any reasonable evidence in the record to sustain it," *State v. Morris*, 215 Ariz. 324, 341 ¶ 77 (2007) (internal quotation marks omitted), and uphold the jury's imposition of the death sentence "so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency," *id.* ¶ 81. We conduct this review "viewing the facts in the light most favorable to sustaining the verdict." *State v. Gunches*, 240 Ariz. 198, 207 ¶ 41 (2016).

¶106 The jury did not abuse its discretion in determining that Champagne deserved death after finding the State proved the following three aggravating circumstances beyond a reasonable doubt: (1) that Champagne was previously convicted of a serious offense under § 13-751(F)(2); (2) that he murdered Hoffner in an especially cruel manner under § 13-751(F)(6); and (3) that he committed multiple homicides on the same occasion under § 13-751(F)(8). Evidence presented during the aggravation phase overwhelmingly established that Champagne was convicted of numerous felonies satisfying the (F)(2) aggravator, including his second-degree murder conviction for the 1991 murder and his convictions for the attempted first-degree murder and aggravated assault of twenty-four police officers for the 2012 shootout case. Similarly, reasonable evidence supported the jury's convicting Champagne of the second-degree murder of Tapaha and thus the jury's finding of the (F)(8) aggravator.

¶107 Moreover, the State presented reasonable evidence to sustain the jury's finding that Champagne murdered Hoffner in an especially cruel manner, satisfying the (F)(6) aggravator. Hoffner witnessed Champagne

murder her boyfriend, Tapaha, when Champagne shot him in the head, placing her in apprehension of her own possible demise. Immediately thereafter, Champagne, holding a gun, led her into the bedroom and gave her methamphetamine. Champagne left Hoffner in the bedroom with Garcia, who was positioned in front of the doorway with a gun in her lap. Champagne quickly returned and strangled Hoffner with an electrical cord. Hoffner unquestionably suffered mental anguish about her own fate while being strangled so shortly after seeing her boyfriend killed. *See State v. Ellison*, 213 Ariz. 116, 142 ¶ 120 (2006) ("Mental anguish is established if the victim experienced significant uncertainty as to her ultimate fate or if the victim was aware of a loved one's suffering." (internal quotation marks omitted)); *State v. Djerf*, 191 Ariz. 583, 595 ¶ 45 (1998) (noting that mental anguish "may also include knowledge that a loved one has been killed"). She also suffered physical pain as she clawed with both hands at her neck trying to breathe as Champagne tightened the cord with each turn of the wrench.

¶108 Even if we assume Champagne proved the various mitigating factors that he argued to the jury, a reasonable jury could have concluded they were not sufficiently substantial to warrant leniency. The thrust of Champagne's mitigation evidence was related to his dysfunctional family, but the State's proffered evidence showing that his mother was loving and supportive tended to rebut his claims that he was an unloved and neglected child. Moreover, the jury reasonably could have given little weight to the impact of his allegedly tumultuous family situation because he was nearly forty-one years old when he murdered Hoffner. *See, e.g.*, *State v. Nelson*, 229 Ariz. 180, 191 ¶ 53 (2012). Thus, the jury did not abuse its discretion in imposing the death sentence.

### K. Other Constitutional Claims

¶109 Champagne raises twenty-three additional constitutional claims which he concedes have been previously rejected by this Court but nonetheless wishes to preserve for federal review. We decline to revisit these claims.

### CONCLUSION

¶110 For the reasons above, we affirm Champagne's convictions and sentences.