NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

# IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellant,*

*v.*

JAMES HUNTER, *Appellee.*

No. 1 CA-CR 20-0043

FILED 1-26-2021

Appeal from the Superior Court in Maricopa County
No. CR2017-002018-001
The Honorable John R. Hannah, Judge

**AFFIRMED IN PART; VACATED IN PART; AND REMANDED**

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Lisa Marie Martin
*Counsel for Appellant*

Sharmila Roy Attorney at Law, Naperville, IL
By Sharmila Roy
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge Cynthia J. Bailey delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Lawrence F. Winthrop joined.

---

**B A I L E Y**, Judge:

¶1 The State appeals the trial court's order (1) granting James Hunter a new trial after he was convicted of three counts of threatening or intimidating to promote a criminal street gang, class three felonies, and (2) denying Hunter a new trial on each count for three lesser-included offenses of threatening or intimidating, class one misdemeanors. For reasons that follow, we affirm the trial court's decision to grant Hunter a new trial on the felony offenses, but we vacate the court's decision to deny a new trial on the misdemeanor offenses. We therefore remand the case for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶2 On Thanksgiving night in 2016, Officer Goit was driving his patrol car in South Phoenix when a black BMW "went zipping past." Goit pursued the BMW, and after determining the car was speeding, he initiated a traffic stop. He turned on his patrol car's flashing lights and siren, but the BMW continued for several blocks.

¶3 As Goit followed, the BMW proceeded to a neighborhood claimed by a criminal street gang called the "West Side City Crips" ("WCC"). The BMW eventually stopped in front of a house in the area, and Goit pulled up behind it. Goit walked over to the BMW and spoke to the driver, S.B. He immediately saw S.B. was "heavily intoxicated." Hunter, who was also intoxicated, was sitting in the front passenger seat. Hunter was a documented member of the WCC, and the BMW had parked next to Hunter's mother's house.

¶4 Goit handcuffed S.B. and placed him in the back of the patrol car while investigating the failure-to-yield violation he had observed. Goit then spoke to Hunter, who eventually agreed to get out of the car and sit on the curb while the officers completed their investigation of S.B. A crowd of about twelve people from the neighborhood soon gathered at the scene, demanding to know what was going on and why the police were there.

¶5        A short time later, other police officers arrived. One officer stood next to Hunter so that Goit could complete paperwork for a driving-under-the-influence investigation of S.B., a process that took more than 40 minutes. During that time, Hunter shouted insults and profanity at the officers. The crowd became more hostile in response to Hunter's shouts, and the officers feared for their safety. Hunter was the "loudest and most aggressive" person in the crowd.

¶6        The BMW was registered to Hunter's girlfriend A.C., who was not with Hunter and S.B. in the car and was not present at the scene. Goit testified that although A.C. was not involved, the police were required to impound her car because S.B. had been driving with a suspended license. At the conclusion of their on-site investigation and while the officers were having the BMW placed on a tow truck, Hunter repeatedly yelled at them that he was "West Side City," the police did not "even know what's coming," the officers were "done," and he was going to start a "war" with them.

¶7        The State charged Hunter with three counts of threatening or intimidating to promote a criminal street gang, class three felonies (Counts 1-3), and assisting a criminal street gang, a class three felony (Count 4). At trial, the State called a detective as an expert to explain gang culture and operations. The detective testified that a criminal street gang's objective is to gain respect and control in a neighborhood, and gang members use fear and intimidation to do so. He stated that gang members could achieve a higher status in a gang by invoking their allegiance to the gang when they threaten others. The expert explained that gang members threaten police officers to intimidate them so that they will stay out of the gang's territory, and gang members gain respect and show loyalty to the gang when they threaten officers.

¶8        Following the close of the State's evidence, Hunter moved for a judgment of acquittal under Arizona Rule of Criminal Procedure 20, arguing the State failed to present substantial evidence of his intent to promote the interests of the WCC. The trial court denied Hunter's Rule 20 motion on Counts 1 through 3 but granted his motion on Count 4.

¶9        During the defense's case, Hunter's gang expert, a retired detective, testified that based on his interview with Hunter, he believed Hunter was not active in the WCC at the time of the incident or afterward. The expert explained that, as a gang detective himself, he did not feel intimidated by threats from gang members, including death threats, because he expected gang members to be hostile to police officers. He

rejected the notion that threats intimidate gang officers or deter them from performing their duties. He said that he was never reluctant to enter a neighborhood because of a gang's presence, nor had he ever heard an officer say he or she did not want to enter a gang territory because of gang members' threats. Hunter did not take the stand in his defense.

¶10            To prove the threatening-or-intimidating offenses as class three felonies under A.R.S. § 13-1202(A)(3), the State was required to establish that Hunter threatened or intimidated the officers "in order to promote, further or assist the interests of" the WCC. The trial court also instructed the jurors on the lesser-included offense of threatening or intimidating as a class one misdemeanor, which did not require proof that Hunter's threats were intended to benefit the gang. *See id.* at (A)(1).

¶11            The jury found Hunter guilty on Counts 1 through 3. After the jury returned the verdicts, Hunter moved for a new trial under Arizona Rule of Criminal Procedure 24.1 arguing, *inter alia*, the verdicts were contrary to law or the weight of the evidence, asserting the State did not prove he intended to promote the interests of the WCC when he threatened the officers. The State responded that Hunter's threats benefitted the gang's interests by intimidating the officers to gain respect and control in its territory.

¶12            In a twelve-page written ruling, the trial court explained that although the evidence was sufficient to withstand Hunter's Rule 20 motion, it found the jury's verdict contrary to the weight of the evidence:

> The question now is whether the evidence, considered as a whole and in light of the Court's training and experience, supports the inference of gang motivation strongly enough to carry the weight of a just verdict. The Court finds that it does not. The evidence is more consistent with the conclusion that the defendant simply lashed out, out of anger and frustration at the situation in which he found himself, with no conscious purpose to promote or assist the gang. In other words, the evidence proved only the lesser-included misdemeanor offense.

¶13            Consequently, the trial court granted a new trial under Rule 24.1(c)(1) "as to the verdict on each of the three counts of conviction on the felony offense set forth in A.R.S. section 13-1202(A)(3)." The court, however, denied the motion "in all other respects, including as it relates to the verdict on the three counts of conviction on the lesser-included

misdemeanor violation of section 13-1202(A)(1)."[1]  The court did not set a new trial and did not vacate the previously scheduled sentencing date.

¶14          The State appealed the court's order, and the court stayed Hunter's sentencing pending resolution of the appeal.  We have jurisdiction under Article 6, Section 9, of the Arizona Constitution, and A.R.S. § 13-4032(2).

## DISCUSSION

### A. The trial court did not abuse its discretion by granting Hunter a new trial on the felony charges.

¶15          The State argues the trial court erred in granting Hunter a new trial on the felony convictions.  "We review a trial court's decision to grant a new trial for an abuse of discretion."  *State v. Fischer*, 242 Ariz. 44, 48, ¶ 10 (2017).

¶16          The trial judge has broad discretion in determining whether to grant a new trial under Rule 24.1(c)(1) and "may weigh the evidence, make credibility determinations, and set aside the verdict and grant a new trial even if there is sufficient evidence in the record to support the verdict."  *Fischer*, 242 Ariz. at 50, ¶ 21.  The trial judge must examine the strength of the evidence and consider the trial's length, the complexity of the issues, and whether the case involves subjects outside the jurors' ordinary knowledge.  *Id.* at 51, ¶ 24.  "If, after full consideration of the case, the court is satisfied that the verdict was contrary to the weight of the evidence, it may set the verdict aside . . . ."  *Id.* at 49-50, ¶ 17.  "[T]he court should explain with particularity the reasons why the jury's verdict is against the clear weight of the evidence."  *Id.* at 51, ¶ 24.

¶17          The reviewing court must defer to the "discretion of the trial judge who tried the case and who personally observed the proceedings."  *Id.* at 50, ¶ 21.  "The appellate court's role is not to weigh the evidence."  *Id.* at 52, ¶ 28.  We "will not disturb an order granting a new trial unless the probative force of the evidence clearly demonstrates that the trial court's action is wrong and unjust and therefore unreasonable and a manifest abuse of discretion."  *Id.* at 51, ¶ 27 (quotation omitted).  The appellate court

---

[1]          Hunter also moved for a new trial on grounds of prosecutorial misconduct, failure to grant a mistrial, and inconsistent verdicts.  Because the jury had convicted Hunter of the felony offenses, it did not reach the lesser-included-misdemeanor offenses.  Hunter's motion did not address those offenses.

"determine[s] whether, resolving every conflict in the evidence in support of the order, substantial evidence supports the trial judge's order." *Id.* at 52, ¶ 28. Because motions for new trial are "rarely granted," they are "almost never reversed on appeal." *See id.* at 51, ¶ 25.

¶18 Applying these principles here, first, the trial court's written ruling demonstrates it gave "full consideration" to the evidence in deciding to set aside the verdicts. *Id.* at 49-50, ¶ 17. As the trial court explained, the evidence presented the sole question of whether Hunter intended to promote, further, or assist the interests of the WCC by invoking his affiliation with the gang when he threatened the officers. The court analyzed the evidence establishing Hunter's intent by sorting it "roughly into three categories": (1) Hunter's statements and conduct at the scene, (2) Hunter's association with the WCC, and (3) expert testimony explaining "how gang members' threats against police officers serve the gang's interests."

¶19 The trial court then comprehensively recounted the evidence within each of those three categories. The State does not argue, much less demonstrate, that the court's account misstated key evidence. *See id.* at 52, ¶ 30. Nor do we find any such errors in our review. Instead, the record fully supports the court's factual summary.

¶20 Second, the trial court "explain[ed] with particularity the reasons" the verdict was against the weight of the evidence. *Id.* at 51, ¶ 24. In examining the first category of evidence, the court noted that although Hunter's threatening words escalated from "profanity to anti-police insults and racial slurs that he repeated" for more than 40 minutes, he did not mention the WCC until the officers were towing the car, as they were finishing their investigation. The court reasoned that if Hunter had intended his threats to "create space for the gang" by deterring officers from entering the gang's territory, he would have invoked his allegiance to the WCC earlier in the encounter or throughout it, while the crowd was larger and more hostile.

¶21 Based on this evidence, the trial court concluded the "timing and context of the defendant's statements about West Side City rebuts the inference of intent to promote the gang's interests." The court found the "more sensible inference" was a "common-sense explanation for the defendant's conduct that had nothing to do with street gangs": Hunter was angry when after more than 40 minutes, he saw the police towing A.C.'s car even though "he could safely take possession of it without driving it," a situation the court found would be "highly aggravating to *anyone*," and out

of his frustration, he invoked the WCC to antagonize the police or make his threats more credible, but without intent to promote any interest other than his own.

¶22　　　　In analyzing the second category of evidence, the court found Hunter's ties to WCC were "debatable."　The court noted the State did not introduce any evidence that showed Hunter was actively involved with the gang when he committed the offenses, even though the court further acknowledged that the State did not have to prove active involvement in a gang to convict Hunter under § 13-1202(A)(3).　Nonetheless, the court reasoned that the absence of evidence showing Hunter's ongoing association with the gang refuted an inference that Hunter was "*acting* on the gang-promotion motive when he threatened the officers," rather than merely threatening the officers out of personal anger.

¶23　　　　The trial court next examined the expert testimony in what it had set forth as the third category of evidence, describing that the testimony was the "keystone of the State's proof of intent."　The court found the testimony of the State's expert was "limited by its shaky foundation" and "problematic," only "partially bridg[ing] the gap in the jurors' knowledge" because the expert failed to account for other explanations for Hunter's behavior.　The court concluded that the testimony of the State's expert "did not support an inference of intent strong enough to bear the weight of a just verdict."

¶24　　　　On the other hand, the trial court found Hunter's expert credible.　In particular, the court agreed with the expert's opinion that threats from gang members do not intimidate officers in gang territory or deter them from enforcing the law.　The court noted that based on the judge's years of experience learning about police culture from the bench, he was not persuaded that threats deter police officers from investigating a gang's crimes.　The court then explained that the "logic of the State's proof of intent required the jury to find that the defendant believed his threats" could deter the officers from enforcing the law in the gang's territory, but the State presented no evidence or argument that Hunter believed he could keep the police away by threatening them with his gang affiliation.

¶25　　　　The State disputes many of the trial court's findings, arguing they were "agenda-driven," inconsistent, and speculative. Specifically, the State challenges: (1) the court's categorization of the evidence, contending it was an improper "divide and conquer" strategy and the "critical flaw" in the court's analysis; (2) the court's conclusion that the "common-sense explanation" for Hunter's threats was more consistent with the evidence

than the State's theory; (3) the court's determination that the State's expert provided a less persuasive opinion than that of Hunter's expert; and (4) the court's inference that Hunter did not intend to benefit the WCC because he would not have believed his threats would be effective in deterring law enforcement from entering the WCC's territory.

¶26            In its challenges to the trial court's findings, the State effectively asks us to act as a "fourteenth juror" and independently evaluate the evidence, which is not within the proper scope of our review. *Fischer*, 242 Ariz. at 52, ¶ 28. We do not substitute our judgment for that of the trial court. *Id.* Instead, we resolve every conflict in favor of the court's decision. *State v. Torres-Soto*, 187 Ariz. 144, 145 (App. 1996). Therefore, we will not overturn the court's order merely because the evidence supported the jurors' verdicts.

¶27            Contrary to the State's assertions, the trial court reached its conclusions by permissibly weighing the evidence and making credibility determinations in its role as the "thirteenth juror." *See Fischer*, 242 Ariz. at 52, ¶ 28. Furthermore, the court's inferences were adequately based on the trial judge's experience, training, and observations of the trial. *Id.* These determinations are all within the trial court's broad discretion, and they are matters to which we defer. And as discussed *supra*, the court appropriately followed our supreme court's directives in *Fischer* to a trial court when deciding whether to grant a new trial under Rule 24.1(c)(1).[2]

¶28            On these facts, we cannot find that Hunter's invocation of the WCC, by itself, compelled the trial court to conclude he intended to benefit the gang by threatening the officers. In considering the matter, we are persuaded in particular by the court's reliance on the "timing and context" of Hunter's threats, further bolstered by the court's assessment that his ties to the gang at the time of the incident were unclear, given that Hunter shouted insults at the officers for over 40 minutes as they investigated a crime in WCC territory, directly in front of his mother's house and a hostile crowd, before he ever mentioned the gang. Therefore, the evidence's probative force does not clearly demonstrate the court's decision was "wrong and unjust." *Fischer*, 242 Ariz. at 51, ¶ 27.

---

[2]      Likewise, because the court properly followed the controlling authority in *Fischer*, we reject the State's argument that the trial court erred by concluding *State v. Harm*, 236 Ariz. 402 (App. 2015), did not require the court to find Hunter intended to promote the gang's interests.

¶29 Finally, the State complains the trial court improperly used Hunter's intoxication to reinforce its ultimate conclusion that he threatened the officers because they were going to tow the car. To support this contention, the State cites the court's statement that witnesses had testified that "Hunter had been consuming alcohol, which would have made him much more prone to aggressive behavior."

¶30 To the extent the court considered Hunter's intoxication to examine his *mens rea* in committing the crimes, the court erred. *See State v. Champagne*, 247 Ariz. 116, 137, ¶ 59 (2019). However, the isolated statement had a minimal bearing, if any, on the court's ultimate conclusion. And other parts of the record show the court was fully aware it could not rely on voluntary intoxication as a defense to a criminal act or state of mind. As the State acknowledges, the court instructed the jurors that voluntary intoxication was not a defense, and during argument on the motion for a new trial, the court expressly rejected Hunter's request to consider his intoxication as a defense to his intent. Accordingly, because substantial evidence supports the trial court's decision to set aside the jury's verdicts, we find no error in its order granting Hunter a new trial.

## B. The trial court erred by failing to order the new trial it had granted.

¶31 The State further challenges the trial court's order denying Hunter a new trial on the threatening-or-intimidating misdemeanor charges, contending the court erred by finding Hunter guilty of those lesser-included offenses instead of allowing the new trial to proceed. We review for abuse of discretion. *Fischer*, 242 Ariz. at 50, ¶ 20.

¶32 "A trial court's discretion under Rule 24.1(c)(1) is not unlimited, nor does the court have unbridled 'veto' power over a jury verdict such that the court may act as a 'super juror' and overturn a verdict merely because the court personally disagrees with it." *Fischer*, 242 Ariz. at 50, ¶ 20. "[T]he court does not usurp the role of the jury in granting a new trial because the court does not substitute its judgment for that of the jury; it only allows the parties a new trial before a different jury." *Id.* at ¶ 21.

¶33 Although the trial court granted Hunter a new trial on the felony offenses, it never set a new trial. Instead, the court sua sponte entered convictions on the lesser-included offenses that the jurors' verdicts had not considered. In doing so, the trial court implicitly acquitted Hunter of the felony charges. Neither Rule 24.1 nor *Fischer* authorizes a trial judge to take such action. *Cf.* Ariz. R. Crim. P. 20; *Peak v. Acuna*, 203 Ariz. 83, 85, ¶¶ 8-9 (2002), *abrogated on other grounds by Fischer*, 242 Ariz. at 50, ¶ 20

(explaining that a trial court's decision to set aside a verdict because it is against the weight of the evidence is not an implied acquittal, unlike when a conviction is reversed based on an insufficiency of evidence). By barring the new trial that the court had granted *in the same order*, the court impermissibly "vetoed" the jurors' verdicts. *See Fischer*, 242 Ariz. at 50, ¶ 20.

**¶34** Without discussing Rule 24.1 or *Fischer*, Hunter cites Rule 31.19 to argue "there is no reason that trial courts considering new trial motions should not have [the same] authority" as that of an appellate court to enter a conviction on a lesser-included offense. Hunter's reliance on Rule 31.19 is unfounded. As Hunter acknowledges, Rule 31.19(d) authorizes only an *appellate court*, not a trial court, to modify a conviction to a lesser-included offense when it finds the evidence was *insufficient* to establish a defendant's guilt for the greater offense. Stated differently, Rule 31.19 confers no authority to a trial court to modify a conviction in any manner, let alone to do so after granting a new trial.

**¶35** Hunter further cites two cases from other jurisdictions to support his contention that the trial court "should" have the "power to modify judgments and enter convictions for lesser-included offenses" without ordering a new trial. Because *Fischer* supports no such proposition, we reject his reliance on those cases. *See State v. Long*, 207 Ariz. 140, 145, ¶ 23 (App. 2004) ("This court is bound by decisions of the Arizona Supreme Court and has no authority to overturn or refuse to follow its decisions."). Moreover, assuming *arguendo* the cited cases support propositions of law that do not violate *Fischer*, we agree with the State that the cases are neither analogous nor persuasive. *See State v. Dean*, 226 Ariz. 47, 53, ¶ 19 (App. 2010) (explaining that cases from foreign jurisdictions may be informative but are not controlling).

**¶36** Therefore, because the trial court exceeded its authority by entering convictions on the threatening-or-intimidating misdemeanor offenses instead of setting a new trial on the felony charges, we vacate the portion of the court's order denying Hunter a new trial on the misdemeanor offenses and its subsequent order setting sentencing on those purported convictions.

## CONCLUSION

**¶37** For the foregoing reasons, we affirm the trial court's order to grant Hunter a new trial on the felony offenses but vacate its order denying

him a new trial on the misdemeanor offenses.  Consequently, we remand the case for a new trial.



AMY M. WOOD • Clerk of the Court
FILED:    AA