NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JASON AARON TUPA, *Appellant*.

No. 1 CA-CR 23-0312

FILED 03-04-2025

Appeal from the Superior Court in Maricopa County
No. CR2020-001622-001
The Honorable David W. Garbarino, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Amy Pignatella Cain
*Counsel for Appellee*

Griffiths Law Firm, PLLC, Tucson
By Sharolynn Griffiths
*Counsel for Appellant*

Eric Benson Bryant, Ltd. Las Vegas, Nevada
*Pro Hac-Vice Co-Counsel for Appellant*

---

**MEMORANDUM DECISION**

Vice Chief Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Cynthia J. Bailey and Judge Andrew M. Jacobs joined.

---

**H O W E**, Judge:

**¶1**  Jason Aaron Tupa appeals his convictions and sentences for sexual abuse and sexual conduct with a minor. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

**¶2**  We view the facts in the light most favorable to sustaining the verdict. *State v. Payne*, 233 Ariz. 484, 509 ¶ 93 (2013).

**¶3**  Tupa and his ex-wife Diandra shared physical custody of their two children, Avery and Hadley, born in 2003 and 2004 respectively (all minors and victims are referred to by pseudonyms). *See* Ariz. R. Crim. P. 31.10(f). At Tupa's house, Avery and Hadley shared a room and bunkbed. Between late 2015 and November 2017, Avery's friend Dylan, born in 2002, also frequently slept over at Tupa's house.

**¶4**  On four occasions in 2016, while Avery was staying at Tupa's home in Mesa, he touched her breasts, digitally penetrated her vagina, and placed his tongue or mouth on her vagina. On a fifth occasion in November 2017, Tupa entered Avery's room and touched her breasts while she attempted to sleep. One time while Dylan was visiting, Tupa rubbed the outside of Dylan's vaginal area and digitally penetrated her.

**¶5**  Ten days after Tupa's November 2017 abuse, Avery disclosed his actions to the school nurse. This led to a forensic interview with Mesa Police Detective Jordan Gallaugher. After talking with Gallaugher, Avery called Tupa to confront him about his abuse. During the call, Tupa neither admitted nor denied touching Avery's breasts or vagina. Gallaugher also spoke with Avery's cousin Cindy, who disclosed an incident around 2006 when she was ten. After Cindy's top came undone while she was swimming with Tupa, he grabbed her from behind and rubbed her breasts. On June 24, 2018, Dylan wrote a letter addressed to Gallaugher, disclosing that Tupa had touched her inappropriately. Consequently, the State charged Tupa with six counts of sexual abuse, *see* A.R.S. § 13-1404(A), and

six counts of sexual conduct with a minor, *see* A.R.S. § 13-1405(A), involving Avery, Cindy, Dylan, and a fourth alleged victim, Hadley's friend, Brenda.

¶6            Before trial, the State moved in limine to preclude Tupa from cross-examining the victims about mental illnesses or medications. Tupa opposed the motion, arguing that the victims' alleged mental health conditions (1) affected their ability to perceive and recall, (2) were relevant to the quality of the police investigation, and (3) provided "necessary and foundational context for how the defendant, the witnesses and law enforcement behaved and interacted during the investigation."

¶7            The court granted the motion in part, precluding Tupa from cross-examining witnesses on any mental health issues the victims had or may have had. The court explained that the information could not come in to attack the credibility of either the victims or the investigators because Tupa did not make an offer of proof that the victims had mental health conditions that affected their ability as a witness. However, the court permitted Tupa to testify to the victims' alleged mental health conditions to "explain why he acted in a certain way." Tupa testified and did not call any other witness.

¶8            The jury found Tupa guilty of all counts related to Avery, Dylan, and Cindy, but acquitted him of the one count of sexual abuse related to Brenda. Tupa timely appealed, and we have jurisdiction. A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## DISCUSSION

¶9            Tupa argues that the trial court erred by (1) limiting the scope of cross-examination, (2) allowing testimony over his sustained objections, (3) limiting the scope of voir dire, and (4) denying his motion for mistrial after alleged prosecutorial misconduct/cumulative error during closing statements.

## I.        Restriction of Cross-Examination

¶10            Tupa argues that the court violated his "due process, fair trial and confrontation rights" by precluding him from cross-examining the victims about "mental health issues and ailments that could have affected their memory and perceptions regarding the alleged sexual misconduct." He also argues that the court violated his due process rights by precluding cross-examination of Gallaugher about a poetry book, "Milk and Honey," and by denying admission of the book. He claims the book influenced Dylan's and Avery's allegations.

¶11 "We review limitations on the scope of cross-examination for abuse of discretion." *State v. Delahanty*, 226 Ariz. 502, 506 ¶ 17 (2011). Although Tupa opposed the State's motion in limine to preclude the scope of cross-examination, he did not raise any constitutional objections in his response. Instead, he argued only that mental health issues were relevant to the victims' credibility and "contextualize[d] and explain[ed] the content of the pretext confrontation call" between Avery and Tupa. We therefore review his constitutional claims, raised for the first time on appeal, for fundamental error. *State v. Boggs*, 218 Ariz. 325, 334 ¶ 38 (2008).

¶12 Of course, "[t]he use of a witness's mental condition for impeachment purposes is proper if there is an indication that the mental condition affected the truth of his testimony." *State v. Dumaine*, 162 Ariz. 392, 406 (1989), *disapproved of on other grounds by State v. King*, 225 Ariz. 87 (2010). However, "many psychiatric conditions do not affect a witness's credibility or his or her ability to observe and communicate." *State v. Champagne*, 247 Ariz. 116, 135 ¶ 53 (2019). Thus, "[b]efore psychiatric history may be admitted to impeach a witness on cross-examination, 'the proponent of the evidence *must* make an offer of proof showing how it affects the witness's ability to observe and relate the matters to which he testifies.'" *Id.* (quoting *State v. Zuck*, 134 Ariz. 509, 513 (1982)).

¶13 Tupa did not make an offer of proof, however. He argues that his response to the State's motion in limine "essentially was an offer of proof" that the victims—primarily Avery—had been diagnosed with various mental health issues, including schizophrenia, "directly relevant to a witness's ability to perceive, recall and/or accurately report." He claims that the "police became aware of these mental health issues while investigating the case and failed to consider them. Citing these issues could be a critical part of the Defendant showing bias and incompetence in the investigation."

¶14 Although Tupa asserted in his response that the victims had mental health issues, including schizophrenia, that affected their ability to perceive, he did not provide any evidence that the victims had mental health issues or that such issues affected their ability to perceive and recall. *See Champagne*, 247 Ariz. at 136 ¶ 54 (upholding exclusion of mental health issues because defendant failed to show that witness's "ability to observe and relate . . . was affected in any way by her mental health diagnoses"); *Dumaine*, 162 Ariz. at 406 (upholding the same). Thus, "there was no way for the judge to conclude that [the victims' alleged] mental difficulties affected [their] abilities as a witness." *See Zuck*, 134 Ariz. at 514 (upholding

exclusion of cross-examination into paranoid schizophrenia). Tupa's conclusory assertions to the contrary are not an offer of proof.

¶15 Tupa also argues that the State opened the door to mental health cross-examination when Avery testified that she learned that the school nurse was a mandatory reporter when she was "in therapy when I was younger." A party may open the door to otherwise inadmissible evidence when it elicits testimony on the topic. *See State v. Far W. Water & Sewer Inc.*, 224 Ariz. 173, 199 ¶ 101 (App. 2010) (as amended). However, Avery's mention of therapy did not refer to mental health issues and was merely an ancillary explanation of how she knew to report abuse to the school nurse. Avery's testimony did not open the door to cross-examination of her alleged mental health issues.

¶16 Further, the court's ruling did not deprive Tupa of any of his fundamental rights. A trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [] cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *State v. Canez*, 202 Ariz. 133, 153 ¶ 62 (2002) (quoting *Delaware v. Van Arsdale*, 475 U.S. 673, 679 (1986)). Although Tupa was precluded from cross-examining witnesses about the victims' alleged mental health issues, he was permitted to and did testify about those issues. He also concedes that he was able to effectively cross-examine Avery on other subjects. Thus, the court did not deprive him of his right to confront the victims.

¶17 Tupa also argues the court erred by both limiting his cross-examination of Gallaugher about "Milk and Honey" and by precluding admission of excerpts from that book. Although the court initially denied admission of excerpts, the court later reversed its ruling and admitted them. Tupa then cross-examined Gallaugher about the excerpts. Thus, Tupa was not precluded from cross-examining Gallaugher about "Milk and Honey."

## II.    Admission of Testimony

¶18 Tupa argues that the court violated his due process rights by allowing the State to ask questions over his objections that were "designed to elicit information that was more prejudicial than probative, and to elicit evidence via leading question, such that the prosecutor was essentially an unsworn witness . . . a clear due process violation." Specifically, he argues that the court erred by permitting the State to ask both Diandra and her ex-boyfriend whether they observed behavioral changes in Avery after an

expert witness in child abuse, Amy Heil, "testified that changed behavior is not determinative of whether abuse occurred or not." Finally, Tupa argues that the court erred by denying his motion for mistrial based on these errors at the end of the second day of trial.

**¶19**  Tupa did not raise any constitutional objections at trial to the controverted testimony, *see State v. Lopez*, 217 Ariz. 433, 434 ¶ 4 (App. 2008) ("An objection on one ground does not preserve the issue on another ground."), and does not develop any argument how the purported wrongful testimony violated his due process rights, *see State v. Johnson*, 247 Ariz. 166, 194 ¶ 91 (2019) (failure to develop due process argument constitutes waiver). Therefore, Tupa has waived his due process argument, and we review the court's ruling on the admissibility of evidence for abuse of discretion. *See State v. Sanders*, 245 Ariz. 113, 128 ¶ 58 (2018). Under that standard, "we uphold a decision if there is 'any reasonable evidence in the record to sustain it.'" *State v. Butler*, 230 Ariz. 465, 472 ¶ 28 (App. 2012) (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 77 (2007)). We review a trial court's denial of a motion for new trial for abuse of discretion. *State v. Hoskins*, 199 Ariz. 127, 142 ¶ 53 (2000).

**¶20**  "Evidence generally is admissible if it is relevant." *State v. King*, 226 Ariz. 253, 257 ¶ 12 (App. 2011); Ariz. R. Evid. 402. Relevant evidence is evidence having "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Ariz. R. Evid. 401. "This standard of relevance is not particularly high." *State v. Oliver*, 158 Ariz. 22, 28 (1988).

**¶21**  Tupa mischaracterizes Heil's testimony as implying that a victim's symptoms are not legally relevant. Heil testified that "we can't look at presence of symptoms or absence of symptoms to make that determination. There has to be some other evidence." But she did *not* testify that abuse victims show no symptoms. In fact, she testified that for victims who do develop symptoms, "we tend to see [] things like depression or anxiety or, you know, attention []issues." In context, Heil testified only that abuse cannot be determined by symptoms alone but must be corroborated by other evidence.

**¶22**  Although behavioral changes are not conclusive of abuse, they may corroborate and thus be relevant. *See United States v. Whiteeyes*, 82 M.J. 168, 176 (C.A.A.F. 2022) (finding child's behavioral changes were corroborative of sexual abuse); *see also State v. Haskie*, 242 Ariz. 582, 586 ¶ 16 (2017) ("Conversely, expert testimony that explains a victim's seemingly inconsistent behavior is admissible to aid jurors in evaluating the victim's

credibility."). Avery's behavioral changes that Diandra and her ex-boyfriend testified to included lower academic performance, exhaustion, and attitudinal changes. The jury could find that this testimony was relevant because the changes were correlated with the abuse.

**¶23** Further, the testimony about Avery's behavioral changes was not unduly prejudicial because it does not have "an undue tendency to suggest decision on an improper basis, such as emotion, sympathy, or horror." *State v. Mott*, 187 Ariz. 536, 545 (1997). Here, Diandra noted that at first Avery's changes seemed consistent with that of an ordinary but moody teenager. The trial court has broad discretion in determining what evidence is relevant or unduly prejudicial. *See State v. Salamanca*, 233 Ariz. 292, 296 ¶ 17 (App. 2013). Given the graphic nature of the victims' testimony against Tupa, testimony about Avery's academic struggles and emotional outbursts did not unduly arise emotion or sympathy. The court did not err.

**¶24** Tupa also takes issue with the State's questioning of Avery's younger sister Hadley about which of them slept in the upper and lower beds of their bunkbed. He argues that when Hadley "testified that she had the top bunk, the State *led* her, over [his] unsustained objection, into changing that into saying [Hadley] had the bottom bunk and [Avery] had the top bunk for a while, which matched [Avery]'s version of events." (Emphasis added.)

**¶25** Tupa's argument is unclear. He does not argue that the testimony was irrelevant or prejudicial or that he was precluded from cross-examining Hadley about the statements. To the extent that he argues that the court improperly allowed the State to lead the witness, this is incorrect. When Hadley testified that she slept in the top bunk in the room she shared with Avery, the State asked if she was "sure that you were on the top bunk." The State did not refer to Avery's contrary testimony that she herself slept in the same bed or otherwise suggest that Hadley actually slept in the bottom bunk. *See Payne*, 233 Ariz. at 513 ¶ 119 ("Leading questions suggest an answer."). But even if the question was leading, "[n]o error occurs, however, when the answer suggested 'had already been received as the result of proper questioning.'" *Id.* (quoting *State v. Garcia*, 141 Ariz. 97, 101 (1984)). Here, the State had already elicited through proper questioning that Avery slept in the top bunk, necessarily implying that Hadley slept in the bottom bunk. Thus, the court did not err by allowing this testimony.

**¶26** Finally, Tupa objects to the State's questioning of Cindy about the pool incident. At trial, Tupa objected to the State's question as leading and speculative, which the court initially overruled. However, the court

sustained Tupa's objection to a different follow-on question and asked the State to "just ask the question in a nonleading form, please." Tupa argues that "the damage had been done at that point," but does not explain how the court erred. Further, at the end of evidence, the court instructed the jurors not to consider responses to any question for which it had sustained an objection. We assume the jurors followed those instructions, *see State v. Prince*, 204 Ariz. 156, 158 ¶ 9 (2003), and did not consider the questions to which objections were sustained, *see Payne*, 233 Ariz. at 513 ¶ 120. Because the court did not err in its evidentiary decisions, it did not err in denying his mistrial motion.

## III.    Voir Dire Questioning

**¶27**        Tupa argues that during voir dire, the court erroneously disallowed "meaningful questioning of proposed jurors about their experience with people who have mental health issues despite a request by the Defendant." Tupa does not cite the trial transcripts but only a minute entry that described the voir dire proceedings and an unrelated juror question. This Court "reviews a trial court's ruling on voir dire of prospective jurors for abuse of discretion and necessarily defers to a trial court's sound discretion in such matters." *State v. Bush*, 244 Ariz. 575, 584 ¶ 29 (2018) (cleaned up).

**¶28**        Our review of the trial transcripts does not demonstrate that Tupa attempted to question potential jurors on their experience with people who have mental health issues. Tupa has misinterpreted the court's minute entry, which notes that discussion was "held regarding State's Motion in Limine 3: Motion to Preclude Mention of Victims' Diagnosed and/or Undiagnosed Mental Illnesses(es) and/or Medication(s)." This discussion related to the State's motion in limine to preclude Tupa from discussing the victims' alleged mental health issues *during trial*.

**¶29**        The motion in limine discussion also occurred after the parties had called all potential jurors for whom they had questions and after the court had dismissed the remainder. During voir dire, Tupa's counsel asked broad ranging questions of potential jurors but never asked about their experience with mental health issues. Ultimately, Tupa's counsel passed the panel for cause. Thus, the court did not disallow Tupa from questioning jurors on mental health issues and committed no error.

## IV.    Cumulative Error

**¶30**        Tupa argues the above-discussed alleged errors as well as alleged prosecutorial misconduct in the State's closing rebuttal argument

constitute cumulative error warranting reversal. He also argues the court erred by denying his motion for mistrial after rebuttal upon the same error.

¶31　　　Specifically, Tupa argues that the State engaged in "vouching" in its rebuttal and points to various objections, some of which were sustained and others overruled. In support, Tupa alleges the prosecutor: (1) vouched and shifted the burden of proof in her rebuttal argument when she stated "[w]hat logical reason does [Avery] have for making this up? I can't think of anything and I know defense can't, either, because he didn't submit anything for your consideration"; (2) engaged in error by referencing the book "Milk and Honey" because it was not in evidence; (3) misled the jury by stating "who gets confronted with allegations of child molestation and doesn't remember it? That's ridiculous"; (4) made arguments based upon facts not introduced at trial when she stated "Defense also talked about how they didn't have any pictures of the pool. But, again the incident happened back in 2005, 2006. [Cindy] wasn't living at that house anymore. She's an adult. We could not take pictures of that house. She doesn't live there"; (5) vouched by attempting "in closing to explain why the jury didn't see certain things whose absence might have caused or contributed to reasonable doubt by blaming the rules of evidence"; and (6) vouched by "describ[ing] a personal experience about a car accident and what she could remember" as support "for the victims whose contradictory information and claimed memory gaps could have created reasonable doubt."

¶32　　　We review the court's denial of Tupa's motion for new trial for abuse of discretion. *Hoskins*, 199 Ariz. at 142 ¶ 53. Because Tupa does not allege any ethical violations, we review for prosecutorial error, not misconduct. *See In re Martinez*, 248 Ariz. 458, 470 ¶ 47 (2020) (courts should avoid characterizing prosecutorial error as misconduct when no ethical violation is alleged); *State v. Murray*, 250 Ariz. 543, 548 ¶ 12 (2021) (cumulative error review is the same for both prosecutorial error and misconduct).

¶33　　　To prevail on a claim of prosecutorial error, a defendant must demonstrate that the prosecutor's error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Sanders*, 245 Ariz. at 132 ¶ 92 (quoting *State v. Hughes*, 193 Ariz. 72, 79 ¶ 26 (1998)). To that end, a defendant must demonstrate that "(1) [error] exists and (2) a reasonable likelihood exists that the [error] could have affected the jury's verdict, thereby denying defendant a fair trial." *Murray*, 250 Ariz. at 548 ¶ 13 (cleaned up) (quoting *Morris*, 215 Ariz. at 335 ¶ 46).

¶34 Tupa cannot demonstrate cumulative error because the court sustained his objections to the State's statements about (3) not remembering allegations of abuse, (4) the State's inability to take photos of the pool, (5) certain things not introduced because of the rules of evidence, and (6) the prosecutor's personal experience with a car accident. Before closing arguments, the court instructed the jury to not consider responses to any question for which it had sustained an objection, and afterwards the court instructed the jury that anything said in closing arguments was not evidence. Further, after the court sustained Tupa's objections to the lack of memory, pool, and car accident statements, the court explicitly told the jury to disregard the State's last statement.

¶35 We assume the jurors followed those instructions and did not consider statements for which the court sustained objections. *See Payne*, 233 Ariz. at 513 ¶ 120. Because the court instructed the jury that "any sustained objection meant that the information must be disregarded," *State v. Newell*, 212 Ariz. 389, 403 ¶ 69 (2006), these comments did not affect the jury's verdict, *see State v. Acuna Valenzuela*, 245 Ariz. 197, 217 ¶ 77 (2018) (The presumption that the jury follows instruction "eradicates a slight possibility of any taint from vouching when the state follows up with an appropriate limiting comment").

¶36 This leaves the statements about (1) why would the victims make up their allegations, and (2) "Milk and Honey." As discussed, the court admitted excerpts from "Milk and Honey." Thus, the State did not err in discussing the book. *See State v. Bible*, 175 Ariz. 549, 602 (1993) ("[D]uring closing arguments counsel may summarize the evidence.").

¶37 Finally, the State's allegations statement, "What logical reason does [Avery] have for making this up? I can't think of anything and I know defense can't, either, because he didn't submit anything for your consideration," was vouching but not burden shifting. Prosecutorial vouching occurs when "the prosecutor places the prestige of the government behind its witness." *State v. Vincent*, 159 Ariz. 418, 423 (1989). Placing the State's prestige behind its witness "involves personal assurances of a witness's veracity." *State v. King*, 180 Ariz. 268, 277 (1994) (quoting *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)). Thus vouching occurs when a prosecutor uses "I" or "me" statements to "indicate what her personal view of the case was to the jury." *Acuna Valenzuela*, 245 Ariz. at 218 ¶ 84. Here the prosecutor vouched because in rhetorically asking, "[w]hat logical reason does [Avery] have for making this up?," she introduced her own personal view, stating, "I can't think of anything."

¶38      The statement, however, did not shift the burden of proof because it discussed Tupa's failure to present evidence, not the standard of proof needed to convict. "When a prosecutor comments on a defendant's failure to present evidence to support his or her theory of the case, it is neither improper nor shifts the burden of proof to the defendant so long as such comments are not intended to direct the jury's attention to the defendant's failure to testify." *State v. Sarullo*, 219 Ariz. 431, 437 ¶ 24 (App. 2008). Here, both parties' theory of the case revolved around the credibility of the victims. Thus, the State's statement was not impermissible burden shifting.

¶39      Even though the State's allegations statement was improper vouching, it by itself does not warrant reversal. Ultimately, "[c]umulative error requires reversal only when [error] is so pronounced and persistent that it permeated the entire atmosphere of the trial." *Acuna Valenzuela*, 245 Ariz. at 224 ¶ 119 (cleaned up). Tupa in general challenges statements that were not error or that he successfully objected to and which the court instructed the jury to disregard. Because we presume the jury follows instructions, *see Payne*, 233 Ariz. at 513 ¶ 120, "[t]he court's instructions to the jury helped mitigate any impact the cumulative [error] had," *State v. Hulsey*, 243 Ariz. 367, 394 ¶ 123 (2018). Further, these six statements all occurred in the State's rebuttal argument; Tupa does not challenge any statement during the State's closing argument. In other words, Tupa cannot show the error was "so pronounced and persistent that it permeated the entire atmosphere of the trial." *Acuna Valenzuela*, 245 Ariz. at 224 ¶ 119 (cleaned up). And although Tupa also argues the alleged errors discussed in the other sections of this decision contribute to cumulative error, for the reasons stated, these were not error. Thus, Tupa cannot demonstrate a likelihood that the statements cumulatively would have affected the jury's verdict. *Murray*, 250 Ariz. at 548 ¶ 13. The court did not err in denying his motion for mistrial.

## CONCLUSION

¶40      We affirm.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:      JR